375 A.2d 925.

LUCY PENG-FEI CHANG *vs.* UNIVERSITY OF RHODE ISLAND.

JULY 18, 1977.

PRESENT: Bevilacqua, C. J., Paolino, Joslin, Kelleher and Doris, JJ.

JOSLIN, J. This is a sex discrimination case. The complainant, a woman of Chinese ancestry, received a masters degree in mathematics from the respondent University of Rhode Island (the university), a nonprofit educational corporation, in 1968. In the spring of that year, she was hired by the university as a full-time instructor on an annual contract basis to teach undergraduate mathematics courses in the College of Business Administration (the college). Her contract was renewed in 1969 and again in 1970.

In the fall of 1970, the newly-appointed dean of the college undertook to upgrade the faculty in an effort to obtain accreditation for the college's graduate program. To that end, in December 1970, he advised the 11 college faculty members (9 men and 2 women) who neither held nor were in the process of obtaining doctoral degrees that they would not be promoted or retained at the conclusion of their 1-year contracts. The complainant, who was one of this group, advised the dean that she had no intention of obtaining her Ph.D.; nevertheless, after failing to find a suitable replacement for her for the coming year, he offered, and she accepted, a final 1-year contract.[1] In December 1971, in accordance with the provisions of the University Manual, complainant was notified in writing that she would not be retained after her contract expired, and in June 1972 her employment was formally terminated. Thereafter, she filed a complaint with the Commission for Human Rights (the commission) alleging that the university had discriminated against her because of her race and sex. After a preliminary investigation of the charges and an unsuccessful attempt at conciliation, the commission issued a complaint against the university on June 28, 1973, charging unlawful discrimination against complainant on the basis of both race and sex.

At the opening of and during the hearings that followed, the university moved to dismiss the complaint for lack of jurisdiction. Those motions were denied, and on January 6, 1975, the commission, in a written decision, concluded (1) that it had jurisdiction over the university; (2) that there was no evidence of racial discrimination; (3) that

---

[1] The University Manual in effect at the time contained a so-called "up or out" clause providing that instructors who were not ready to be taken for promotion by the end of their fourth year would not be renewed thereafter. The complainant evidently was not considered promotable, though apart from her lack of a Ph.D. the record does not indicate why; thus, the manual required that her fourth 1-year contract be her last.

sex discrimination did not become illegal in this state until May 13, 1971; and (4) that certain actions taken by the university after that date had discriminated against complainant because of her sex.[2] Orders appropriate to those findings were entered, and the university then sought judicial review in the Superior Court;[3] complainant was granted leave to intervene in the review proceedings. The trial justice, without reaching the merits of the controversy, concluded that

> "during the period in question, the Fair Employment Practices Act had no application to the University and the Commission had no jurisdiction to investigate, approve, modify, revise, sanction or condemn the employment practices of the University."

Having thus concluded that there was a jurisdictional deficiency, the trial justice quashed the commission's decision and remanded the case with directions that the complaint be dismissed. We granted certiorari. *Chang* v. *University of Rhode Island,* 116 R.I. 904, 351 A.2d 601 (1976).

We begin with a brief description of the measures taken

---

[2]The commission's findings included the following:

"1) the respondent has committed an unlawful employment practice in paying the complainant less money than men for equal work; 2) through the application of its 'PhD holder or candidate only' policy, neutral on its face but discriminatory in its effect, the respondent has failed and refused to hire and unjustly discharged the complainant because of her membership in the female class; 3) the employee review system used to evaluate Ms. Chang's ability was so lacking in ascertainable standards and fairness as to be an unlawful employment practice; and 4) the refusal of the respondent to promote Ms. Chang, based as it was on actions found unlawful here, was itself unlawful."

[3]The university appealed under two separate statutatory provisions: the Fair Employment Practices Act, G.L. 1956 (1968 Reenactment) §28-5-28, which provides for Superior Court review of final decisions of the Commission for Human Rights; and the Administrative Procedures Act, G.L. 1956 (1969 Reenactment) §42-35-15, which provides generally for judicial review of agency decisions.

in this state to ensure equal employment opportunities. In 1949, the General Assembly enacted the Fair Employment Practices Act (the Act), P.L. 1949, ch. 2181 [codified in amended form at G.L. 1956 (1968 Reenactment) title 28, ch. 5]. In pertinent part, the Act (1) declared it to be an unlawful employment practice for any "employer" to refuse to hire an applicant for employment or to discharge or discriminate against any employee because of "race or color, religion, or country of ancestral origin * * *"; (2) defined the term "employer" to exclude, among others, any "educational * * * corporation or association not organized for private profit * * *"; and (3) established the commission[4] and charged it with, *inter alia*, receiving, investigating and passing upon charges of unlawful employment practices.

On May 13, 1971, the Act was amended to prohibit discrimination in employment on account of sex as well. Public Laws 1971, ch. 35, §1 (codified at §28-5-5.1). At that time, however, as well as when the alleged discriminatory acts against complainant occurred, the Act's definition of an "employer" still excluded nonprofit educational institutions. Not until 1974—long after the events giving rise to this litigation took place—did the Legislature abrogate that exclusion. Public Laws 1974, ch. 259, §1 [codified at §28-5-6(B)].[5]

---

[4]The administrative agency created in 1949 to enforce the Act was originally known as the Commission for Fair Employment Practices. Public Laws 1949, ch. 2181, §5(A). The name was later changed to the Commission Against Discrimination, P.L. 1952, ch. 2958, §1, and finally to the Commission for Human Rights. General Laws 1956 (1968 Reenactment) §28-5-8, as amended by P.L. 1968, ch. 160, §1.

[5]See note 9 *infra*. The 1974 amendment also expressly included "the state and all political subdivisions thereof" within the definition of the term "employer." General Laws 1956 (1968 Reenactment) §28-5-6(B), as amended by P.L. 1974, ch. 259, §1. Previously, the Act had neither expressly included nor expressly excluded the state. The university, citing

In seeking to establish the commission's jurisdiction over the university in the face of the pre-1974 statutory exclusion, complainant relies primarily on Executive Order No. 27, promulgated by Governor Licht on May 16, 1972. This was one of a series of executive orders issued by three governors between 1964 and 1974, all mandating nondiscrimination by state agencies and establishing procedures to effect that mandate,[6] and was the first such order to be issued after the enactment of the 1971 amendment prohibiting sex discrimination in employment. It declared that any state employee claiming to have been discriminated against could seek redress by filing a complaint with the

---

*City of Pawtucket* v. *Pawtucket Teachers' Alliance Local 930*, 87 R.I. 364, 141 A.2d 624 (1958), argues that the Act did not apply to state employees prior to the 1974 amendment. In view of our conclusion that until 1974 the university was excluded from the operation of the Act by virtue of its status as a nonprofit educational institution, we express no opinion on the pre-1974 application of the Act to state employees.

[6]Executive Order No. 10, issued by Governor Chafee on January 23, 1964, established a Code of Fair Practices to regulate, *inter alia,* employment practices in the executive branch; §8 of the Order required all state agencies to cooperate with the Commission Against Discrimination, as the Commission for Human Rights was then called, and to "duly comply with its requests and recommendations for effectuating the State's policy against discrimination."

Executive Order No. 8, issued by Governor Licht on June 9, 1969, mandated nondiscriminatory employment practices on the part of state agencies and ordered the commission to enforce that mandate. Executive Order No. 27, issued by Governor Licht on May 16, 1972 after the Act had been amended to prohibit sex discrimination, is identical to Executive Order No. 8 except for the addition of the word "sex" in the appropriate places; it is set out in full at note 7 *infra.* Executive Order No. 32, issued by Governor Licht on August 28, 1972, promulgated a Code of Fair Practices that included detailed regulations of the employment practices of state agencies and called for the development of affirmative action plans. Executive Order No. 14, issued by Governor Noel on January 22, 1974, superseded Governor Licht's Executive Orders Nos. 8 and 32 and established a new Code of Fair Practices.

commission, which was ordered to investigate and act thereon in accordance with its regular procedures.[7]

Employees of the university are, of course, employees of the state, and, to the extent that Executive Order No. 27 purported to give the commission jurisdiction over the employment practices of the university, it directly conflicted with the pre-1974 provision of the Act specifically excluding nonprofit educational institutions from its coverage. Thus, the issue in this case is whether the governor of this state, notwithstanding his limited power under our constitution, *Gorham* v. *Robinson,* 57 R.I. 1, 17, 186 A. 832, 841 (1936), can by executive order override a direc-

---

[7] The full text of Governor Licht's Executive Order No. 27 is as follows:

"WHEREAS, it is imperative to assure and to protect all employees of the State of Rhode Island against discrimination based on race, creed, color, sex, national origin or ancestry, in their recruitment, assignment, promotion or other aspects of employment by State agencies:

"NOW, THEREFORE, by virtue of the authority vested in me as Governor of the State of Rhode Island and Providence Plantation, I order:

"(1) There shall be no discrimination by any state agency or official representative thereof against any employee of the State of Rhode Island because of race, creed, color, sex, national origin or ancestry, or because of any complaint, grievance or appeal brought under the provisions of this order.

"(2) The State of Rhode Island Human Rights Commission shall receive and investigate all complaints and shall take action thereon as it deems necessary and proper in accordance with the procedure established by the State of Rhode Island Human Rights Commission.

"(3) Any employee or group of employees of the State of Rhode Island claiming to have been discriminated against because of race, creed, color, sex, national origin or ancestory by any department, agency or official representative thereof may file a written complaint with the State Commissioner on Human Rights.

"This Executive Order shall take effect on the date hereof.

"/s/ Frank Licht
Frank Licht
GOVERNOR"

tive of the Legislature, the body to which the constitution assigns all powers of government not given to either the executive or the judicial department and not prohibited by the constitution itself. *City of Providence* v. *Moulton,* 52 R.I. 236, 241, 160 A. 75, 77 (1932). More narrowly and simply put, the issue is, which prevails—Executive Order No. 27, which extends the benefits of the Act to all state employees, or the pre-1974 provision of the Act that specifically excludes nonprofit educational institutions from its operative effect?

Although no authority bearing directly on this issue has been called to our attention, complainant comments in her brief that the relevant provisions of our constitution have the same meaning as the comparable provisions of the Federal Constitution, and she suggests that "federal cases dealing with executive power establish standards by which to measure the power of the Governor to issue executive orders on Fair Employment Practices."

That suggestion commends itself to us, and accordingly we look first to the concurring opinion of Mr. Justice Jackson in *Youngstown Sheet & Tube Co.* v. *Sawyer,* 343 U.S. 579, 634, 72 S.Ct. 863, 869, 96 L.Ed. 1153, 1198 (1952), which has frequently been cited—and which is relied upon by the parties to this suit—as providing an appropriate analytical framework for determining the extent of executive power. In that opinion, Mr. Justice Jackson, though acknowledging that his groupings may be somewhat oversimplified, distinguishes three kinds of "practical situations in which a President may doubt, or others may challenge, his powers * * *." *Id.* at 635, 72 S.Ct. at 870, 96 L.Ed. at 1199. First, the President may act pursuant to congressional authorization, express or implied; in such cases "his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate." *Id.* Second, the President may act in the

absence of either a congressional grant or denial of authority; in doing so "he can only rely upon his own independent powers, but there is a zone of twilight in which he and Congress may have concurrent authority, or in which its distribution is uncertain. " *Id.* at 637, 72 S.Ct. at 871, 96 L.Ed. at 1200. Finally, the President may take measures that are incompatible with the express or implied will of Congress; but when he does so

"his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter. Courts can sustain exclusive presidential control in such a case only by disabling the Congress from acting upon the subject. Presidential claim to a power at once so conclusive and preclusive must be scrutinized with caution, for what is at stake is the equilibrium established by our constitutional system." *Id.* at 637-38, 72 S.Ct. at 871, 96 L.Ed. at 1200.

Clearly this case falls squarely within the third grouping, for Executive Order No. 27, to the extent that it purported to subject the university to the commission's jurisdiction, conflicted with the express will of the Legislature, which as of that date excluded nonprofit educational institutions from the definition of the term "employer." Consequently, under Justice Jackson's analysis, the order can be supported only if regulation of the university's employment practices was exclusively within the executive domain and beyond the control of the Legislature. *Id.* at 640, 72 S.Ct. at 872, 96 L.Ed. at 1201.

But that obviously is not the case. Article XII, §1 of the Rhode Island Constitution[8] "expressly and affirma-

---

[8]Article XII, §1 provides:

"Duty of general assembly. — The diffusion of knowledge, as well as of virtue, among the people, being essential to the preservation of their rights and liberties, it shall be the duty of the general assembly to promote public schools, and to adopt all means which they may deem necessary and proper to secure to the people the advantages and opportunities of education."

tively reserves to the legislature *sole* responsibility in the field of education * * *." *Royal* v. *Barry,* 91 R.I. 24, 31, 160 A.2d 572, 575 (1960) (emphasis added). In the exercise of that constitutional responsibility, the Legislature delegated exclusive authority and control over state educational institutions and functions to the Board of Regents for Education, G.L. 1956 (1969 Reenactment) title 16, ch. 49, as enacted by P.L. 1969, ch. 231, §3, including the power "to employ presidents, professors, instructors, and other employees, and to determine their salaries * * *." Section 16-31-5. Thus, when Executive Order No. 27 was issued, the Board of Regents possessed the exclusive right, subject to applicable provisions of law, to determine who would be employed at state institutions of higher education. The governor lacked authority to act with respect to that subject. By express constitutional grant, that power belonged to the Legislature; and it had delegated a portion thereof to the Board of Regents, not to the governor.

We therefore hold that Executive Order No. 27, insofar as it purported to regulate the employment practices of the university, represented an exercise of authority beyond the governor's power under the constitution and laws of this state.

In the alternative, complainant argues that the 1974 amendment to the Act, which clearly subjects the university to the commission's jurisdiction,[9] is procedural and

---

[9] General Laws 1956 (1968 Reenactment) §28-5-6(B), as amended by P.L. 1974, ch. 259, §1, provides in pertinent part:

"The term 'employer' includes the state and all political subdivisions thereof and any person in this state employing four (4) or more individuals, and any person acting in the interest of an employer directly or indirectly."

This not only abrogates the exclusion for nonprofit educational institu-

remedial, rather than substantive, in nature, and that therefore, under the principle recognized most recently in *Fox* v. *Fox*, 115 R.I. 593, 597, 350 A.2d 602, 604 (1976), that amendment should be applied retroactively to claims that, like hers, were pending at the time of its enactment.

In support of this retroactivity argument, complainant cites several federal cases that have held that §717(c) of Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. §2000e-16(c) (1974), which was added to Title VII of the Equal Employment Opportunity Act of 1972, Pub. L. No. 92-261, §11, 86 Stat. 112, applies retroactively to claims of discrimination that were awaiting administrative decision on its effective date.[10] Section 717(c) affords federal employees a private right of action in federal court for the redress of employment discrimination based on race, color, religion, sex, or national origin. Prior to its enactment, however, federal employees claiming to have been discriminated against were not remediless, but had been limited to administrative remedies. The courts that have applied §717(c) retroactively have done so on the ground that it merely provides a new and additional remedy for

tions, but also expressly includes the state within the definition of the term "employer"; thus, there can be no doubt that the university is now subject to the operation of the Act and to the jurisdiction of the commission.

[10]*Adams* v. *Brinegar*, 521 F.2d 129 (7th Cir. 1975); *Sperling* v. *United States*, 515 F.2d 465, 473-74 (3d Cir. 1975), *cert. denied*, U.S. , 96 S.Ct. 2623, 49 L.Ed.2d 372 (1976); *Brown* v. *GSA*, 507 F.2d 1300, 1304-06 (2d Cir. 1974), *aff'd on other grounds*, 425 U.S. 820, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976); *Womack* v. *Lynn*, 504 F.2d 367 (D.C. Cir. 1974); *Koger* v. *Ball*, 497 F.2d 702 (4th Cir. 1974). *Contra, Place* v. *Weinberger*, 497 F.2d 412 (6th Cir.), *cert. denied*, 419 U.S. 1040, 95 S.Ct. 526, 42 L.Ed.2d 316 (1974), *vacated*, 426 U.S. 932, 96 S.Ct. 2643, 49 L.Ed.2d 383-84 (1976 (order denying certiorari vacated, certiorari granted, judgment vacated and case remanded to court of appeals for further consideration in light of *Brown* v. *GSA, supra*).

a preexisting right. The complainant urges us to take the same view of the 1974 amendment to our Act.

There is, however, a critical difference between the pre-1972 federal law and our pre-1974 Act. Although Congress in §701(b) of Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. §2000e(b) (1974), excluded the United States from the definition of the term "employer," thus precluding federal employees from seeking relief under that statute, in another part of §701(b) it expressly provided

> "[t]hat it shall be the policy of the United States to insure equal employment opportunities *for Federal employees* without discrimination because of race, color, religion, sex or national origin and *the President shall utilize his existing authority to effectuate this policy.*" Civil Rights Act of 1964, Pub. L. No. 88-352, Title VII, §701(b), 78 Stat. 254 (emphasis added).

Thus, Congress expressly authorized the creation of substantive rights in Federal employees by executive order, and, pursuant to that authorization, implementing executive orders were issued creating such rights and providing for their enforcement.[11] It is therefore clear that the addition of §717(c) to Title VII in 1972 did not establish a new right, but merely provided a new remedy for substantive rights already in existence by virtue of the 1964 declaration of policy and the executive orders promulgated pursuant thereto.

In sharp contrast, the pre-1974 version of our Act contains no comparable provision authorizing the issuance of executive orders extending the benefits of the Act to employees of non-profit educational institutions. It is true that the Act in §28-5-5, as amended by P.L. 1973, ch. 132, §1, recognizes and declares "[t]he right of all individuals in this state to equal employment opportunities * * *."

---

[11] *Brown v. GSA,* 507 F.2d 1300, 1304 n.6 (2d Cir. 1974), *aff'd,* 425 U.S. 820, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976); *Womack v. Lynn,* 504 F.2d 267, 269 n.5 (D.C. Cir. 1974).

But "specific terms covering the given subject matter will prevail over general language of the same * * * statute which might otherwise prove controlling." *Kepner* v. *United States*, 195 U.S. 100, 125, 24 S.Ct. 797, 803, 49 L.Ed. 114, 123 (1904); *accord, Clifford F. MacEvoy Co.* v. *United States ex rel. Calvin Tomkins Co.*, 322 U.S. 102, 107, 64 S.Ct. 890, 894, 88 L.Ed. 1163, 1167 (1944); *Hartford Accident & Indem. Co.* v. *City of Tulare*, 30 Cal. 2d 832, 835, 186 P.2d 121, 123 (1947); *Charlton Press, Inc.* v. *Sullivan*, 153 Conn. 103, 110, 214 A.2d 354, 357 (1965). Otherwise, the specific provision would be rendered nugatory, in violation of the cardinal rule that every word, clause and sentence of a statute must be given effect if possible. *D. Ginsberg & Sons, Inc.* v. *Popkin*, 285 U.S. 204, 208, 52 S.Ct. 322, 323, 76 L.Ed. 704, 708 (1932); *Bristol County Water Co.* v. *Public Util. Comm'n*, 117 R.I. 89, 94, 363 A.2d 444, 447 (1976); *Ewing* v. *Tax Assessors*, 90 R.I. 86, 90, 155 A.2d 61, 63 (1959). Clearly, therefore, the general language of §28-5-5 does not create substantive rights in persons expressly and specifically excluded from the benefits of the Act by the statutory definition of the term "employer"; nor does it grant power to the governor to extend rights to such persons by executive order. Thus, university employees had no substantive right under state law to be free of employment discrimination until 1974. Accordingly, we hold that the 1974 amendment to the Act is substantive, not procedural, and therefore has prospective effect only.

The petition for a writ of certiorari is denied and dismissed, the writ heretofore issued is quashed, and the

644

papers in the case are ordered returned to the Superior Court with our decision endorsed thereon.

*Milton Stanzler, Esq., Abedon, Stanzler, Biener, Skolnik & Lipsey,* for plaintiff.

*Patrick A. Liguori, Esq., Adler, Pollock & Sheehan, Incorporated,* for defendant.