In re REQUEST FOR ADVISORY OPINION FROM The HOUSE OF REPRESENTATIVES (COASTAL RESOURCES MANAGEMENT COUNCIL).

No. 2007–370–M.P.

Supreme Court of Rhode Island.

Dec. 18, 2008.

Sandra Lanni, Warwick, for the Rhode Island House of Representatives.

Joseph S. Larisa, Providence, for the Office of the Governor.

Rebecca Tedford Partington, Providence, for the Office of the Attorney General.

Present: WILLIAMS, C.J., FLAHERTY, SUTTELL, and ROBINSON, JJ.

To the Honorable, the House of Representatives of the State of Rhode Island and Providence Plantations:

We have received your request seeking the advice of the justices of this Court, in accordance with the provisions of article 10, section 3 of the Rhode Island Constitution, concerning legislation (2007–H 6266) that is presently pending before the House of Representatives. The questions propounded are as follows:

"(1) Would the proposed act, if duly enacted into law, which permits members of the General Assembly to sit as members of the Coastal Resources Management Council (CRMC) as set forth in R.I.G.L. 46–23–2(a)(1), violate the constitutional amendment to Article IX, Section 5, so called Separation of Powers Amendment, passed by the electorate on November 2, 2004, which calls into question the constitutionality of the appointing authority?

"(2) Would the proposed act, if duly enacted into law, permit the Speaker of the House to appoint public members to the Coastal Resources Management Council (CRMC) as set forth in R.I.G.L. 46–23–2(a)(1)?

"(3) Is the Constitutional Amendment to Article IX, Section 5, so-called Separation of Powers Amendment, passed by the electorate on November 2, 2004, which calls into question the constitutionality of the appointing authority, self executing or does it require legislative enactment for its implementation?

"(4) Is the Coastal Resources Management Council (CRMC) by its nature, purpose, and operation a legislative function * * *[?]"

Pursuant to the provisions of article 10, section 3 of the Rhode Island Constitution it is our duty to issue an advisory opinion at the request of the House of Representatives [1] when the question concerns the constitutionality of pending legislation. *In re Advisory Opinion (Chief Justice)*, 507 A.2d 1316, 1318 (R.I.1986). We would note, however, that this particular request for an advisory opinion comes to us under somewhat unusual circumstances: the pending legislation (2007–H 6266) is, in effect, a reenactment (with virtually no substantive alteration) of the CRMC enabling statute that is currently in force. *See* G.L.1956 (2007 reenactment) chapter 23 of title 46. Requests for advisory opinions concerning the "constitutionality of *existing statutes* which require implementation by the Chief Executive" may only be propounded by the Governor. *In re Advisory Opinion (Chief Justice)*, 507 A.2d at 1319 (emphasis added). In view of that principle, the House's constitutional authorization to propound the above-quoted questions to the justices of this Court is somewhat less than self-evident. However, the existence of significant questions of law in an area of important public concern has convinced us, not without some hesitation, that we should respond. We would respectfully note, however, that in the future we may be less inclined to respond substantively to requests for advisory opinions that come to us from either chamber of the General Assembly under circumstances similar to those here present.[2]

---

1. The same constitutional provision similarly empowers the Senate to request advisory opinions from the justices of this Court with respect to pending legislation.

2. It should be noted that the justices of this Court on various occasions have declined to answer requests for advisory opinions. *See, e.g., In re Advisory Opinion to the Governor (Casino III)*, 904 A.2d 67 (R.I.2006) (mem.)

For the reasons set forth below, it is our opinion that question (1) and the first clause of question (3) should be answered in the affirmative and questions (2) and (4) should be answered in the negative.

# I

## The Separation of Powers Amendments

In November of 2004, the electorate of the State of Rhode Island approved the so-called separation of powers amendments. These amendments ushered in four fundamental changes to the Rhode Island Constitution and, for the first time in Rhode Island's history, clearly and explicitly established three separate and distinct departments of government.

Those fundamental changes may be summarized as follows:

(1) Article 3, section 6 was amended to preclude legislators from serving on state boards, commissions, or other state or quasi-public entities that exercise executive power;

(declining to issue an advisory opinion requested by the Governor because the questions did not have a bearing on a present constitutional duty awaiting performance by the Governor); *In re Request for Advisory Opinion Regarding House Bill 83–H–5640*, 472 A.2d 301 (R.I.1984) (noting that the justices of this Court cannot answer questions requiring the exercise of the judiciary's fact-finding power); *Opinion to the House of Representatives*, 433 A.2d 944 (R.I.1981) (declining to respond to a request where the questions propounded by the House of Representatives were involved in litigation pending in the Superior Court); *In re Advisory Opinion to the Senate*, 108 R.I. 551, 277 A.2d 750 (1971) (noting that the potential constitutional deficiency of pending legislation must be specifically identified by the requesting party).

**3.** As we discuss in section III, *infra*, the separation of powers doctrine should not be understood as precluding some degree of functional overlap between and among the three

(2) Article 5 was amended to provide that the powers of the Rhode Island government are distributed into "three separate and distinct departments";

(3) Article 6, section 10, which had vested broad "continuing powers" in the General Assembly, was repealed; and

(4) Article 9, section 5 was amended to give the Governor appointment power with respect to members of any state or quasi-public entities exercising executive power, subject to the advice and consent of the Senate.

■ The doctrine of separation of powers, which is now expressly established in the Rhode Island Constitution, declares that governmental powers at the state level are divided among "three separate and distinct departments."[3] In practice, this doctrine operates to confine legislative powers to the legislature, executive powers to the executive department, and judicial powers to the judiciary, precluding one branch of the government from usurping the powers of another.[4] R.I. Const. art. 5.

departments of government. As ever, "[w]e must remember that the machinery of government would not work if it were not allowed a little play in its joints." *Plantation Legal Defense Services, Inc. v. O'Brien*, 121 R.I. 595, 597, 401 A.2d 1277, 1278 (1979) (quoting *Bain Peanut Co. v. Pinson*, 282 U.S. 499, 501, 51 S.Ct. 228, 75 L.Ed. 482 (1931) (Holmes, J.)).

**4.** This Court has quoted with approval the words of Justice Lewis Powell of the United States Supreme Court: "Functionally, the doctrine [of separation of powers] may be violated in two ways. One branch may interfere impermissibly with the other's performance of its constitutionally assigned function. * * * Alternatively, the doctrine may be violated when one branch assumes a function that more properly is entrusted to another." *City of Pawtucket v. Sundlun*, 662 A.2d 40, 58 (R.I.1995) (quoting *I.N.S. v. Chadha*, 462 U.S. 919, 963, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983) (Powell, J., concurring)).

While there can be no doubt that the separation of powers amendments constitute an important recalibration of the system of checks and balances within our state government, we do not view the amendments as effectuating a wholesale reallocation of power among the executive and the legislative departments. We emphasize, however, that the pendulum has not now swung to the opposite extreme with the adoption of the 2004 constitutional amendments. While the formal incorporation of the doctrine of separation of powers into the Constitution has established a somewhat different balance of power among the departments from that which existed previously, it would be overly simplistic and patently erroneous to view the amendments as somehow *subordinating* the role of the legislative branch to that of the executive.

It is incontestably true that, for most of its history, the Rhode Island General Assembly enjoyed significantly more power than did the legislatures of most of our sister states. *See generally City of Pawtucket v. Sundlun*, 662 A.2d 40, 44 (R.I. 1995); *Kennedy v. State*, 654 A.2d 708, 710–11 (R.I.1995); *Nugent v. City of East Providence*, 103 R.I. 518, 525–26, 238 A.2d 758, 762 (1968).[5] A few years prior to the adoption of the separation of powers amendments, in *In re Advisory Opinion to the Governor (Rhode Island Ethics Commission—Separation of Powers)*, 732 A.2d 55 (R.I.1999), four justices of this Court discussed at some length the rather unique history of our colonial and state governance. They noted that, as of that time (1999), "the Legislature continued to exercise substantial executive functions by electing all judicial officers as well as many officers who might be considered part of the executive branch," and they concluded that "Rhode Island's history is that of a quintessential system of parliamentary supremacy." *Id.* at 64. The justices also observed, however, that "only the people of Rhode Island may change the structure of their government," and they further observed that "the sole and proper procedure for restricting legislators from serving on or appointing [other persons] to executive boards and commissions is through an amendment to the constitution approved by the electorate * * *." *Id.* at 72.

5. In an advisory opinion that was issued a decade ago, the then-justices of this Court cogently summarized the prevailing understanding of the allocation of sovereign power in this state:

"It has been set forth in *Payne & Butler v. Providence Gas Co.*, [31 R.I. 295, 77 A. 145 (1910),] that from the granting of the charter of King Charles II, July 8, 1663, to the date of the acknowledgment of our independence by the British Crown, the Rhode Island Legislature possessed the complete powers conferred by the royal charter and thereafter from the time of independence the Legislature had the combined powers of crown and Parliament, which included all attributes of sovereign authority. * * * After May 29, 1790, when this state in convention ratified the Federal Constitution, those powers were limited by that Constitution. Thereafter, until May 1843, the Legislature retained all residual powers of sovereignty, save those delegated to the federal government. * * * In 1843 these powers were again diminished by limitations set forth in our State Constitution.

"Unlike the United States Congress, the Rhode Island General Assembly does not look to our State Constitution for grants of power. * * * Accordingly, this court has consistently adhered to the view that the General Assembly possessed all of the powers inhering in sovereignty other than those which the constitution textually commits to the other branches of our state government and that those that are not so committed * * * are powers reserved to the General Assembly." *In re Advisory Opinion to the Governor (Rhode Island Ethics Commission—Separation of Powers)*, 732 A.2d 55, 62–63 (R.I.1999) (internal quotation marks and some internal citations omitted).

As previously noted, in November of 2004 the electorate of Rhode Island approved four such amendments. As a result, separation of powers is now a principle that is firmly established within our state's organic law, whereby the fundamental powers of government are distributed among its three coordinate branches. We are also mindful, however, of Mr. Justice Jackson's exegetical comment with respect to the Constitution of the United States:

> "While the Constitution diffuses power the better to secure liberty, it also contemplates that practice will integrate the dispersed powers into a workable government. It enjoins upon its branches separateness but interdependence, autonomy but reciprocity." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (Jackson, J., concurring).

 This Court has said that, in construing constitutional amendments, our chief function is to give effect to the intent of the framers. *State ex rel. Webb v. Cianci*, 591 A.2d 1193, 1201 (R.I.1991); *Bailey v. Baronian*, 120 R.I. 389, 391, 394 A.2d 1338, 1339 (1978) (citing *In re House of Representatives*, 45 R.I. 289, 120 A. 868 (1923)). In doing so, we rely on the well-established rule of constitutional construction that, when words in a constitution are free from ambiguity, they are to be given their plain, ordinary, and usually accepted meaning. *Davis v. Hawksley*, 119 R.I. 453, 455, 379 A.2d 922, 923 (1977). When the language at issue is clear, we need look no further. In the lapidary words of a distinguished federal appellate court: "Statutory construction begins with the plain text, and, 'where the statutory language provides a clear answer, it ends there as well.'" *Raila v. United States*, 355 F.3d 118, 120 (2d Cir.2004) (quoting *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438, 119 S.Ct. 755, 142 L.Ed.2d 881 (1999)); *see also Connecticut National Bank v. Germain*, 503 U.S. 249, 253–54, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992); *State v. Martini*, 860 A.2d 689, 691 (R.I. 2004); *State v. Benoit*, 650 A.2d 1230, 1232 (R.I.1994).[6]

The proponents and drafters of the constitutional amendments, which were designed to bring about a greater degree of separation of powers in Rhode Island's governmental structure, manifestly carried out their task with precision. Certain powers of the General Assembly were explicitly curtailed, while others were left largely or entirely unaffected by the amendments.

For example, one of the proposals ultimately approved by the electorate was the abolition of the venerable "continuing powers" provision of the Constitution (article 6, section 10); that provision expressly allowed the General Assembly to continue to exercise any power that it had possessed prior to the 1986 constitutional convention unless expressly prohibited by the Constitution. The continuing powers conferred by article 6, section 10 were characterized by this Court as "plenary." *City of Pawtucket*, 662 A.2d at 44. It is clear that those "continuing powers" have now been explicitly and definitively repealed.

 In contrast, the separation of powers amendments did not, either explicitly or implicitly,[7] limit or abolish the pow-

---

6. While some of the cases cited in the text involve statutory (as opposed to constitutional) construction, the hermeneutic principles that they set forth are applicable in both contexts.

7. Repeals by implication are disfavored by the law. "Where the repealing effect of a statute is doubtful, the state is strictly construed to effectuate its *consistent* operation with previous legislation." 1A Norman J. Singer, *Suth-*

er of the General Assembly in any other area where we have previously found its jurisdiction to be plenary.[8] Such areas include the General Assembly's duty to provide for the state's natural environment (article 1, section 17); its regulatory power over lotteries (article 6, section 15); and its duty with respect to education and public library services (article 12, section 1).

## II

## Are the Separation of Powers Amendments Self–Executing?

Article 5 of the Rhode Island Constitution states that "[t]he powers of the government shall be distributed into three separate and distinct departments: the legislative, executive and judicial."

Article 3, section 6 of the Rhode Island Constitution provides in part:

"No senator or representative shall, during the time for which he or she was elected, be appointed to any state office, board, commission or other state or quasi-public entity exercising executive power under the laws of this state, and no person holding any executive office or serving as a member of any board, commission or other state or quasi-public entity exercising executive power under the laws of this state shall be a member of the senate or the house of representatives during his or her continuance in such office." [9]

Article 9, section 5 provides:

"The governor shall, by and with the advice and consent of the senate, appoint all officers of the state whose appointment is not herein otherwise provided for and all members of any board, commission or other state or quasi-public entity which exercises executive power under the laws of this state; but the general assembly may by law vest the appointment of such inferior officers, as they deem proper, in the governor, or within their respective departments in the other general officers, the judiciary or in the heads of departments."

In determining whether or not a particular constitutional provision is self-executing, we have found it helpful to begin by considering the standard so cogently enunciated by the United States Supreme Court in its much-cited opinion in the case

---

*erland on Statutes and Statutory Construction* § 23:10 at 353 (5th ed.1993) (emphasis in original); *see also Berthiaume v. School Committee of Woonsocket*, 121 R.I. 243, 248–49, 397 A.2d 889, 893 (1979) ("Only when * * * two statutory provisions are irreconcilably repugnant will a repeal be implied * * *. We have also stated that if two statutes are found not to be inconsistent with one another and relate to the same subject matter, they are deemed in [p]ari materia and should be considered together so that they will harmonize with each other and be consistent with their general object and scope, even though they contain no reference to one another and were passed at different times.") (internal quotation marks omitted).

**8.** When we are called upon to construe statutory or constitutional language, our role is to look at the legal scheme as a whole, and read the particular language at issue in that broader context. *See generally Davis v. Michigan Department of Treasury*, 489 U.S. 803, 809, 109 S.Ct. 1500, 103 L.Ed.2d 891 (1989); *Raila v. United States*, 355 F.3d 118, 120 (2d Cir.2004). Whenever possible, constitutional provisions should be read to coexist, so that both may stand and be operative.

**9.** Although the questions propounded by the House do not specifically reference article 3, section 6 of the Rhode Island Constitution, we note that this provision, which was adopted as an amendment at the same time as article 9, section 5, has a direct bearing on the resolution of both questions (1) and (3). For the sake of efficiency, we shall take this opportunity to address the status of art. 3, sec. 6 and art. 9, sec. 5 with respect to the question of self-execution.

of *Davis v. Burke,* 179 U.S. 399, 21 S.Ct. 210, 45 L.Ed. 249 (1900):

"A constitutional provision may be said to be self-executing if it supplies a sufficient rule by means of which the right given may be enjoyed and protected, or the duty imposed may be enforced; and it is not self-executing when it merely indicates principles, without laying down rules by means of which those principles may be given the force of law. * * * In short, if complete in itself, it executes itself." *Id.* at 403, 21 S.Ct. 210 (internal quotation marks omitted).[10]

We are of the opinion that article 3, section 6 and article 9, section 5 are self-executing. Both article 3, section 6 and article 9, section 5 in effect constitute rules that endow general separation of powers principles with the force of law. These two provisions are manifestly more than mere aspirational statements of general constitutional principles; they neither explicitly mandate nor inherently require further legislative action for them to become fully effective.

 Article 3, section 6 clearly prohibits sitting legislators from serving on administrative entities that exercise executive power; it is complete in itself. Likewise, article 9, section 5 provides a brief, though no less complete, description of the appointment power now vested in the Governor and the means by which the chief executive may exercise that power. For these reasons, both provisions should be considered to be self-executing.

**10.** While in the course of this opinion we make frequent reference to certain decisions of the United States Supreme Court which nicely discuss certain basic principles relative to the allocation of governmental power, we do not suggest that Rhode Island's constitutional separation of powers doctrine or the implementation thereof must necessarily be

### III

### Appointments to the CRMC

Having expressed our view that article 1, section 17 has not been impliedly repealed or altered by the adoption of the separation of powers amendments, we must next consider the nature and extent of the legislative power that constitutionally may be exercised pursuant to that provision.

We first focus on the language of article 1, section 17 itself:

"The people shall continue to enjoy and freely exercise all the rights of fishery, and the privileges of the shore, to which they have been heretofore entitled under the charter and usages of this state, including but not limited to fishing from the shore, the gathering of seaweed, leaving the shore to swim in the sea and passage along the shore; and they shall be secure in their rights to the use and enjoyment of the natural resources of the state with due regard for the preservation of their values; and it shall be the duty of the general assembly to provide for the conservation of the air, land, water, plant, animal, mineral and other natural resources of the state, and *to adopt* all means necessary and proper by law to protect the natural environment of the people of the state by providing adequate resource planning for the control and regulation of the use of the natural resources of the state and for the preservation, regeneration and restoration of the natural environment of the state." (Emphasis added.) [11]

the mirror image of what has transpired at the federal level over the years.

**11.** "[T]his jurisdiction has consistently recognized that 'adopt' is synonymous with 'enact.' " *In re Advisory Opinion to the Governor (Ethics Commission),* 612 A.2d 1, 9 (R.I. 1992).

■ We have held that "the General Assembly's power to regulate marine fisheries is broad and plenary." *Riley v. Rhode Island Department of Environmental Management*, 941 A.2d 198, 206 (R.I. 2008). Indeed, the justices of this Court have said that the General Assembly's power in this area "is plenary * * * and is no longer open to question." *Opinion to the Senate*, 87 R.I. 37, 40, 137 A.2d 525, 526 (1958). As recently as last term, this Court found "no limitation, in the Constitution, of the power of the General Assembly to legislate in this regard, and [the legislative department] may delegate the administration of [its] regulations to such officers or boards as [it] may see fit." *Riley*, 941 A.2d at 209; *see also Opinion to the Senate*, 87 R.I. at 39-40, 137 A.2d at 526.[12]

■ This Court has implicitly recognized that the coordinate branches of government should ordinarily defer to the General Assembly's exercise of its plenary legislative powers. *See, e.g., Chang v. University of Rhode Island*, 118 R.I. 631, 375 A.2d 925 (1977). In the areas where the General Assembly possesses plenary power, "all * * * determinations [are left] to the General Assembly's broad discretion to adopt the means *it* deems 'necessary and proper' in complying with the constitutional directive." *City of Pawtucket*, 662 A.2d at 56 (emphasis in original); *see also Chang*, 118 R.I. at 637-38, 375 A.2d at 928-29. However, the plenary powers conferred upon the General Assembly by our Constitution are nonetheless circumscribed by "the textual limitations to that power that are specified in the federal or state Constitutions." *City of Pawtucket*, 662 A.2d at 44; *see also Riley*, 941 A.2d at 209.

The foregoing description of the plenary powers of the General Assembly parallels descriptions provided by the United States Supreme Court with respect to the plenary powers of Congress under the United States Constitution; the United States Supreme Court has stated that "Congress has plenary authority in all areas in which it has substantive legislative jurisdiction, * * * so long as the exercise of that authority does not offend some other constitutional restriction." *Buckley v. Valeo*, 424 U.S. 1, 132, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (citing *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579 (1819)).

The Rhode Island Constitution, like the federal Constitution, vests the "legislative power" of the state in "two houses, the one to be called the senate, the other the house of representatives; and both together the general assembly." R.I. Const. art. 6, sec. 2. As is true under the federal constitu-

The first edition of The American Heritage Dictionary of the English Language was published in 1969 (*i.e.*, just one year before the adoption of the pertinent language of article 1, section 17). The primary definition of the verb "enact" in that 1969 edition (at page 429) is: "To make (a bill) into an act; decree by legislative process; pass." *See also Webster's Third New International Dictionary* 45 (1961) (defining "enact" as to "make into a law; *esp:* to perform the last act of legislation upon (a bill) that gives the validity of law").

12. It is important to note that this Court has remarked that, in the exercise of its plenary power over the fisheries, the General Assembly may either legislate or delegate the *administration of regulation* to an agency. It is absolutely beyond cavil that the General Assembly may, by legislative enactment, make laws regulating pisciculture, designating fisheries as public or private, prohibiting fishing when necessary, and the like. *See, e.g., Riley v. Rhode Island Department of Environmental Management*, 941 A.2d 198 (R.I.2008); *Cherenzia v. Lynch*, 847 A.2d 818 (R.I.2004); *State v. Nelson*, 31 R.I. 264, 77 A. 170 (1910). Likewise, at no time has this Court ever suggested that the General Assembly may not delegate to another body the quasi-legislative authority to adopt administrative regulations, conduct investigations, or refine policy.

tional scheme, exercise of the legislative power to make law requires (1) the concurrence of the two chambers of the legislature (bicameralism) and (2) presentation of the adopted bill to the chief executive for endorsement (presentment). *Id.;* R.I. Const. art. 9, sec. 14.

■■■■ Complete and unlimited delegation of the legislative power to an administrative body, which by its nature cannot satisfy the requirements of bicameralism and presentment, would be unconstitutional.[13] It has long been established, however, that legislatures can delegate so-called quasi-legislative power[14] to other bodies pursuant to the exercise of their plenary powers without offending the nondelegation doctrine, provided that they furnish these entities with sufficient guidance.[15] *See, e.g., Almond v. Rhode Island Lottery Commission,* 756 A.2d 186, 192 (R.I.2000); *see also Milardo v. Coastal Resources Management Council,* 434 A.2d 266, 271 (R.I.1981) ("[I]t is the conditions of the delegation[,] the specificity of the functions delegated, the standards accompanying the delegation, and the safeguards against administrative abuse that

we examine in determining the constitutionality of a delegation of power."); *see generally Whitman v. American Trucking Associations, Inc.,* 531 U.S. 457, 472, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001) ("[W]hen Congress confers decisionmaking authority upon agencies *Congress* must lay down by legislative act an intelligible principle to which the person or body authorized to [act] is directed to conform.") (internal quotation marks omitted) (emphasis in original); *Buttfield v. Stranahan,* 192 U.S. 470, 496, 24 S.Ct. 349, 48 L.Ed. 525 (1904) ("We may say of the legislation in this case * * * that it does not, in any real sense, invest administrative officials with the power of legislation. Congress legislated on the subject as far as was reasonably practicable, and from the necessities of the case was compelled to leave to executive officials the duty of bringing about the result pointed out by the statute. To deny the power of Congress to delegate such a duty would, in effect, amount but to declaring that the plenary power vested in Congress to regulate foreign commerce could not be efficaciously exerted.").

■■■■ The doctrine of separation of powers does not prohibit some overlapping of

**13.** In other words, the General Assembly may not properly delegate to an administrative entity the legislative responsibility for determining, in the exercise of discretion, what the law shall be. *See* 16 Corpus Juris Secundum *Constitutional Law* § 256 at 404–05 (2005). It is equally true, however, that a legislative body like the General Assembly

"may confer discretion in the administration of the law * * * which will enable it to perform its function in laying down policies and establishing standards, while leaving to selected instrumentalities the making of subordinate rules within prescribed limits and the determination of facts to which the policy as declared by the legislature is to apply. * * * The true distinction is between the delegation of power to make the law, which necessarily involves a discretion as to what it shall be, and conferring an authority or discretion as to its execution,

to be exercised under and in pursuance of the law; and while the first cannot be done, to the latter no valid objection can be made." *Id.*

**14.** Quasi-legislative powers consist in the authority to make rules and regulations having the force of law. They are essentially legislative in character (*i.e.,* rules of prospective effect) but are not strictly speaking within the legislative power or function as constitutionally defined.

**15.** Justice Cardozo, employing a memorable metaphor, observed that the powers and functions of an administrative agency must be "canalized within banks that keep it from overflowing." *A.L.A. Schechter Poultry Corp. v. United States,* 295 U.S. 495, 551, 55 S.Ct. 837, 79 L.Ed. 1570 (1935) (Cardozo, J., concurring).

functions. The resolution of the problems with which government must grapple requires a certain degree of pragmatism; we are not in the pristine realm of algebraic equations, but rather in the complex and infinitely nuanced real world. Accordingly, administrative agencies may combine, to a certain extent, the functions of all three departments of government. *See Town of East Greenwich v. O'Neil*, 617 A.2d 104, 112–13 (R.I.1992) ("[R]igid adherence to doctrinaire notions of the nondelegation doctrine would unduly hamper the Legislature's exercise of its constitutionally vested powers."); *see also Buckley*, 424 U.S. at 121, 96 S.Ct. 612 (noting that there is no "hermetic sealing off" of the powers delegated to each of the departments of the federal government by virtue of the federal Constitution).[16] Legislative, judicial, and executive functions are routinely and appropriately combined in a single agency. *See* 1 Richard J. Pierce, Jr., *Administrative Law Treatise*, § 2.3 at 40 (4th ed.2002) ("[a]gencies are saturated with mixtures of legislative, executive, and judicial powers").

■ Nevertheless, as the United States Supreme Court has noted, the principle of separation of powers will be violated where the legislative department tries to control the execution of its enactments directly, instead of indirectly by passing new legislation. *See, e.g., Bowsher v. Synar*, 478 U.S. 714, 733–34, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986) ("[O]nce Congress makes its choice in enacting legislation, its participation ends. Congress can thereafter control the execution of its enactment only indirectly—by passing new legislation."). Direct legislative control of executive powers would be an impermissible usurpation of the central function of a coordinate branch.

■ Given the language of the separation of powers amendments, it is now our task to ascertain whether or not the CRMC exercises executive power. If it does exercise such power to any meaningful degree, then, pursuant to the plain language of the separation of powers amendments, two significant conclusions ineluctably result: (1) no member of the General Assembly nor an appointee of that body may sit on the CRMC; and (2) appointments to the CRMC are to be made exclusively by the Governor (in the exercise of his or her constitutionally conferred appointment power) with the advice and consent of the Senate.

Upon examination of the CRMC's organic statute, chapter 23 of title 46, it appears that the CRMC combines functions that must properly be characterized as executive with functions that are quasi-legislative and quasi-judicial in nature. This is so even though the CRMC is an independent body not subject to direct gubernatorial supervision or control.

"The executive power is the power to execute the laws, that is, to carry them into effect, as distinguished from the power to make the laws and the power to judge them." 16A Am.Jur.2d *Constitutional Law* § 255 at 159 (1998); *see also* 16 Corpus Juris Secundum *Constitutional Law* § 354 at 593–94 (2005). The executive power is also commonly characterized as being the power relating to the "enforcement of the law" and the power to "administer the law." 16 Corpus Juris Secundum *Constitutional Law* § 354 at 593.

---

**16.** This somewhat more flexible approach to the issue of lawful delegation implicitly acknowledges the wisdom of the sometimes-overlooked maxim that "common sense often makes good law." *State v. Lead Industries Association*, 951 A.2d 428, 476 n. 51 (R.I. 2008) (quoting *Peak v. United States*, 353 U.S. 43, 46, 77 S.Ct. 613, 1 L.Ed.2d 631 (1957)).

The CRMC's organic statute, which was adopted by the General Assembly pursuant to its plenary power over the state's environmental resources, states that its provisions "shall be enforced by the coastal resources management council." Section 46–23–18.4.[17] The CRMC is authorized to "administer * * * programs" developed pursuant to its quasi-legislative power to develop policy and adopt regulations. Section 46–23–6(1)(v)(A)(VII). The CRMC may also "enforce[ ] and implement[ ] riparian rights[.]" Section 46–23–6(4)(v).

Furthermore, § 46–23–7(a)(2) authorizes "[CRMC] staff, conservation officers within the department of environmental management, and state and municipal police * * * to issue written cease and desist orders in any instance where activity is being conducted which constitutes a violation of any provisions of [the] chapter." In addition, CRMC staff, DEM conservation officers, and police are empowered "to apply to a court * * * for a warrant to enter on private land to investigate possible violations of this chapter." Section 46–23–7(a)(3). The chairperson and the executive director of the CRMC are also authorized "to assess an administrative penalty" of up to $2,500 for certain violations of the chapter. Section 46–23–7.1(1).

It is clear to us that the above-summarized powers and functions of the CRMC are manifestly executive in nature. To state that *all* of the CRMC's powers and functions are legislative would be to blind oneself to that reality. To do so would be to willfully ignore the language of article 5 of the Rhode Island Constitution, which expressly requires the three departments of government to be "separate and distinct." The duties and functions to be conferred on the CRMC pursuant to the proposed legislation are not unconstitutional; the CRMC may constitutionally combine functions that may best be described as quasi-legislative, executive, and quasi-judicial in nature.

In our opinion, the proposed CRMC legislation, which is the subject of the questions posed to us, cannot be reconciled with our Constitution to the extent that it would permit sitting legislators to serve on the CRMC and would allow the General Assembly to make some appointments to that body.[18] In other words, in view of the fact that the CRMC exercises executive

---

**17.** The questions propounded by the House relate to the proposed act, identified as "2007–H 6266," which would simultaneously repeal G.L.1956 chapter 23 of title 46 in its entirety and reenact the CRMC's enabling statute, with no apparent material alteration, at G.L.1956 chapter 23.3 of title 46. For the sake of simplicity, we shall refer to the provisions of the statute currently in force and not to the nearly identical provisions of 2007–H 6266.

**18.** In our view, the constitutional impropriety of the CRMC in exercising certain powers because of the method by which its members have been selected since 2004 should not affect the validity of the CRMC's administrative actions and determinations to this date. The past acts of the CRMC should be accorded *de facto* validity.

We note that the United States Supreme Court has, on analogous occasions, declined to invalidate past governmental actions presumably taken in good faith prior to judicial resolution of a complex legal question. The Court has also declined to provide retrospective remedies which would substantially disrupt governmental programs and functions. *See, e.g., Lemon v. Kurtzman,* 411 U.S. 192, 208–09, 93 S.Ct. 1463, 36 L.Ed.2d 151 (1973) (plurality opinion) (declining to provide retrospective remedies which would substantially disrupt governmental programs and functions); *see also Buckley v. Valeo,* 424 U.S. 1, 142, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) ("[T]he [Federal Elections] Commission's inability to exercise certain powers because of the method by which its members have been selected should not affect the validity of the Commission's administrative actions and determinations to this date * * *.").

power, the Governor has the right to appoint its members with the advice and consent of the Senate.

We are impressed by the following passage from the decision of the United States Supreme Court in *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976):

> "The position that because [the legislature] has been given explicit and plenary authority to regulate a field of activity, it must therefore have the power to appoint those who are to administer the regulatory statute is both novel and contrary to the language of the Appointments Clause." *Id.* at 132, 96 S.Ct. 612.

We believe that those words are equally applicable to the substantially parallel appointment provision (article 9, section 5) contained in our own recently amended Constitution. Under the Rhode Island Constitution, the Governor has, by virtue of the separation of powers amendments, been explicitly granted the power of appointment, subject to the advice and consent of the Senate; he has that power of appointment with respect to all officers and all members of public bodies exercising executive power. R.I. Const. art. 9, sec. 5. We would observe that the United States Supreme Court in *Buckley* spoke similarly about the President's power to make appointments: [19]

> "Principal officers are selected by the President with the advice and consent of the Senate. Inferior officers Congress may allow to be appointed by the President alone, by the heads of departments, or by the Judiciary. No class or type of

officer is excluded because of its special functions. * * * Neither has it been disputed * * * that the [Appointments] Clause controls the appointment of the members of a typical administrative agency even though its functions, as this Court [has] recognized * * *, may be 'predominantly quasijudicial and quasi-legislative' rather than executive. The Court [has] * * * carefully emphasized that although the members of such agencies were to be independent of the Executive in their day-to-day operations, the Executive was not excluded from selecting them." *Buckley*, 424 U.S. at 132–33, 96 S.Ct. 612 (quoting *Humphrey's Executor v. United States*, 295 U.S. 602, 625–26, 55 S.Ct. 869, 79 L.Ed. 1611 (1935)).

Without retreating from the foregoing views with respect to the effect of the separation of powers amendments on the appointment process, we would also emphasize that the General Assembly remains fully empowered to carry out its constitutional duty to protect the natural environment of the state through the vigorous and proactive exercise of its legislative powers. Nothing written in this advisory opinion should be construed as implying that the General Assembly does not retain the fullness of its constitutionally bestowed fact-finding powers and oversight responsibility with respect to the protection of the natural environment. We also note that the legislative branch of our state government also retains an important role in the appointment process due to the fact that the

---

19. "[The president] shall have power, by and with the advice and consent of the senate, to make treaties, provided two thirds of the senators present concur; and he shall nominate, and by and with the advice and consent of the senate, shall appoint ambassadors, other public ministers and consuls, judges of the supreme court, and all other officers of the United States, whose appointments are not herein otherwise provided for, and which shall be established by law: but the congress may by law vest the appointment of such inferior officers, as they think proper, in the president alone, in the courts of law, or in the heads of departments." U.S. Const. Art. II, sec. 2.

Senate may approve or reject gubernatorial appointments.

It is also important to note that the General Assembly retains without diminution its vast constitutional power to enact, revise, or repeal laws concerning coastal management and preservation of natural resources.[20] In the course of exercising its plenary legislative power, the General Assembly may, for example, (1) provide specific criteria with respect to CRMC membership composition and qualifications; (2) narrow or expand the mandate of the CRMC; (3) adopt more elaborate oversight procedures and safeguards; (4) mandate training for new CRMC members; (5) require periodic reports on CRMC activities; (6) retain the right to review CRMC decisions in discrete areas relating to budget or revenue; (7) create a joint subcommittee to oversee coastal resources management; (8) create procedures for the thorough and rigorous vetting of CRMC nominees (including disclosure statements); (9) limit the Governor's removal power; (10) assume performance of the CRMC's rulemaking functions; or (11) restructure the CRMC in to one or more bodies exercising either purely quasi-legislative or purely executive functions.[21]

Some of these approaches, and others, have been suggested in various bills that were introduced in the House of Representatives and the Senate, particularly during the period following adoption of separation of powers, when the organic legislation of many administrative bodies was being brought into conformity with the requirements of the new system. *See, e.g.,* 2005–H 5003, § 27 (concerning qualifications for appointment to the CRMC); 2005–H 5074, § 1 (abolishing the state lottery commission, establishing a state lottery division within the Department of Administration, and proposing a permanent joint committee on state lottery); 2005–H 5271, § 1 (proposing creation of a "sunset commission" to assist the General Assembly in oversight and review of administrative entities); 2005–H 5818, §§ 1–2 (concerning appointment to the CRMC, procedures for removal, reporting require-

---

**20.** Indeed, the General Assembly's plenary power under article 1, section 17 is so extensive that it is free to abolish the CRMC altogether—although, in the quite unlikely event that such a development were to occur, the General Assembly would still have to find some other feasible mechanism for carrying out the important "duty" that article 1, section 17 imposes on the legislature.

**21.** We note, however, that such reorganization would be a daunting task. The following observation in a respected treatise is quite insightful:

"Agencies, both pure Executive Branch and independent, make [prospective] rules based on agency policy decisions virtually every day. Agencies of both types execute the laws in every conceivable sense of the word. Agencies also adjudicate far more disputes involving individual rights than all of the federal courts combined—a function that would seem to bear most comfortably the label 'judicial.' These powers routinely are combined in a single agency, and the same individuals * * * are responsible for the agency's many functions * * *.
"* * * *
"[D]ecisions about combining or separating the three kinds of power long have been made primarily on the basis of convenience and efficiency, not on the basis that the powers must be separated * * *. [A strict restructuring of agencies to eliminate such overlap of powers] would be far less efficient than the present structure." 1 Richard J. Pierce, Jr., *Administrative Law Treatise* § 2.3 at 39–40 (4th ed.2002).

As discussed above, the CRMC itself routinely combines executive, quasi-legislative, and quasi-judicial powers. We stress, however, that many of the CRMC's functions may be significantly more difficult to classify as strictly executive or legislative in character, and this advisory opinion does not give us occasion to provide a comprehensive classificatory scheme encompassing all of that body's powers and functions.

ments, and training requirements for new members); 2005–H 6172, § 1 (concerning annual reporting requirements of the water resources board); 2008–S 2855, § 1 (concerning appointments to the CRMC, reporting requirements, and training requirements for new members). We do not, by making reference to these previously proposed bills, imply our endorsement of any particular bill, proposal, or statutory scheme, nor should we be read as opining on the constitutionality *vel non* of any of the various approaches; we simply wish to observe that creative proposals for legislative modifications with respect to the CRMC and other administrative bodies constituted pursuant to the General Assembly's exercise of its plenary powers have been made and surely will continue to be made. In addition to considering the above-noted proposals, the General Assembly is free to adopt, by law, any other approach to carrying out its duty to preserve the natural resources of the state pursuant to article 1, section 17 that is not repugnant to our Constitution.

We conclude by respectfully urging the Governor and the General Assembly to discuss the various subjects addressed in this advisory opinion with the goal of reaching a mutually satisfactory agreement regarding the rights and duties conferred upon each department by the terms of our Constitution.

Respectfully submitted,

/s/
Chief Justice Frank J. Williams

/s/
Justice Francis X. Flaherty

/s/
Justice Paul A. Suttell

/s/
Justice William P. Robinson III

/s/

Justice GOLDBERG did not participate.