Antone VIVEIROS et al.

v.

TOWN OF MIDDLETOWN et al.

No. 2008–166–Appeal.

Supreme Court of Rhode Island.

July 2, 2009.

Rhode Island Constitution: Once a municipality has adopted a home-rule charter, must any change to the charter be accomplished only in accordance with the amendment procedures set forth in section 8 of article 13 of the Rhode Island Constitution, or may a new charter be adopted pursuant to procedures outlined in sections 6 and 7 of article 13?

The plaintiffs, Antone Viveiros, Albert Gauthier, and Carolyn Frye, appeal from an entry of summary judgment in favor of the Town of Middletown (the town), frustrating their quest to replace the town's existing charter with a new charter. This case came before the Supreme Court for oral argument pursuant to an order directing the parties to show cause why the issues raised in this appeal should not be summarily decided. After examining the written and oral submissions of the parties, we are of the opinion that the appeal may be resolved without further briefing or argument. For the reasons stated in this opinion, we affirm the judgment of the Superior Court.

# I

## Facts and Procedural History

Joseph R. Palumbo, Esq., Middletown, for Plaintiff.

Francis S. Holbrook, Esq., for Defendant.

Present: GOLDBERG, Acting C.J., and FLAHERTY, SUTTELL, ROBINSON, JJ., and WILLIAMS, C.J. (Ret.).

## OPINION

Justice SUTTELL, for the Court.

We are presented in this case with a question of constitutional construction concerning the home-rule provisions of the

The facts of this case are not in dispute. On January 8, 2007, Antone Viveiros submitted an initiative petition to the town clerk of the Town of Middletown for certification and presentment to the town council. The initiative petition, purportedly signed by 15 percent of the town's qualified electors (those persons qualified to vote), proposed that the following questions be presented to the voters at a special or general election: (1) whether a new town charter should be adopted to replace the existing town charter and, if so, (2) who should be elected to a charter commission to frame a new town charter.

On January 11, 2007, the town solicitor returned the petition to Mr. Viveiros with a letter maintaining that the requested procedure did not conform to article 13 of the Rhode Island Constitution, which establishes home rule for the cities and towns of Rhode Island. The letter informed Mr. Viveiros that the requested procedure is available only "in a situation where a municipality seeks to adopt a charter in the first instance."[1] The town solicitor characterized the proposal as an attempt to amend the existing town charter and thus informed Mr. Viveiros that he must follow the mandate of the amendment provision of article 13.

The plaintiffs filed the instant action on February 5, 2007. They sought a declaratory judgment that article 13 of the state constitution allows the submission of Mr. Viveiros's petition and that, pursuant to that petition, the qualified electors of the town must be allowed to vote on whether a new charter should be adopted and, if so, elect a charter commission to frame such new charter. The plaintiffs also requested the issuance of a writ of mandamus directing the town clerk and town council to fulfill their ministerial duties in regard to the petition.

The plaintiffs and the town filed cross-motions for summary judgment in May

1. Article 13 of the Rhode Island Constitution contains the following relevant provisions:
   "**Section 6. Charter commissions.**—Every city and town shall have the power to adopt a charter in the following manner: Whenever a petition for the adoption of a charter signed by fifteen percent of the qualified electors of a city, or in a town by fifteen percent, but not less than one hundred in number, of those persons qualified to vote on any proposition to impose a tax or for the expenditure of money shall be filed with the legislative body of any city or town the same shall be referred forthwith to the canvassing authority which shall within ten days after its receipt determine the sufficiency thereof and certify the results to the legislative body of said city or town. Within sixty days thereafter the legislative body of a city shall submit to its qualified electors and the legislative body of a town shall submit to the electors of said town qualified to vote upon a proposition to impose a tax or for the expenditure of money the following question: 'Shall a commission be appointed to frame a charter?' and the legislative body of any city or town shall provide by ordinance or resolution a method for the nomination and election of a charter commission to frame a charter consisting in a city of nine qualified electors and in a town of nine electors of said town qualified to vote upon a proposition to impose a tax or for the expenditure of money who shall be elected at large without party or political designation and who shall be listed alphabetically on the ballot used for said election.

   Such ordinance or resolution shall provide for the submission of the question and the election of the charter commission at the same time. Upon approval of the question submitted the nine candidates who individually receive the greater number of votes shall be declared elected and shall constitute the charter commission.
   "**Section 7. Adoption of charters.**—Within one year from the date of the election of the charter commission the charter framed by the commission shall be submitted to the legislative body of the city or town which body shall provide for publication of said charter and shall provide for the submission of said charter to the electors of a city or town qualified to vote for general state officers at the general election next succeeding thirty days from the date of the submission of the charter by the charter commission. If said charter is approved by a majority of said electors voting thereon, it shall become effective upon the date fixed therein.
   "**Section 8. Amendments to charters.**—The legislative body of any city or town may propose amendments to a charter which amendments shall be submitted for approval in the same manner as provided in this article for the adoption of a charter except that the same may be submitted at a special election, and provided further that in the case of a town, amendments concerning a proposition to impose a tax or for the expenditure of money, shall be submitted at a special or regular financial town meeting."

and June 2007, respectively. At a hearing on the motions, on August 3, 2007, the hearing justice agreed with the town that a home-rule charter could be amended, altered or revised only in the manner prescribed by the amendment provision of article 13. She disagreed with plaintiffs' interpretation of the state constitution that the procedure for "adoption" of a home-rule charter also pertained to replacing an existing charter with a new charter. In so deciding, the hearing justice denied plaintiffs' motion and granted the town's motion for summary judgment. Final judgment was entered on August 20, 2007. The plaintiffs filed a timely notice of appeal on August 28, 2007.[2]

On appeal, plaintiffs argue that the hearing justice erred in granting summary judgment in favor of the town because the home-rule provisions of the state constitution do not distinguish between the adoption of the town's initial charter and the adoption of any subsequent charter to replace an existing charter. The plaintiffs maintain that the words used in sections 6 and 7 of article 13 are free of ambiguity and do not limit the use of the procedures set out therein to the adoption of a city or town's initial charter. Had the framers of the home-rule provisions intended that the mandates of sections 6 and 7 of article 13 apply only in the case of the adoption of a municipality's initial charter, plaintiffs argue, those provisions easily could have stated as much. Additionally, plaintiffs contend that the words "amend" and "replace" have entirely different connotations: "Replace" is synonymous with "supplant"

or "substitute," while "amend" connotes a mere "alteration" of something that already exists. Therefore, plaintiffs argue, the amendment provision does not apply to a wholesale replacement charter.

The town responds that the language of the state constitution and case law envision the adoption of a municipal charter as a one-time event. It maintains, also, that plaintiffs' action is, as a practical matter, nothing more than an attempt to amend the Middletown charter in a manner different from what is prescribed by the state constitution because "it would be virtually impossible to adopt a new charter without retaining some of the provisions of the existing charter." The town contends, alternatively, that any change, even a total change, still must be considered an amendment.

## II

### Standard of Review

In matters of constitutional interpretation, this Court's " 'chief purpose is to give effect to the intent of the framers.' " *Riley v. Rhode Island Department of Environmental Management* 941 A.2d 198, 205 (R.I.2008). We "employ the well-established rule of construction that when words in the constitution are free of ambiguity, they must be given their plain, ordinary, and usually accepted meaning." *Id.* (quoting *City of Pawtucket v. Sundlun,* 662 A.2d 40, 45 (R.I.1995)). " [E]very clause must be given its due force,' " meaning " 'no word or section must be assumed to have been unnecessarily used

**2.** On March 19, 2007, after the instant action was filed but before the summary judgment hearing, the town council proceeded to appoint a nine-member commission to review the existing town charter and make recommendations to the town council on potential amendments. Subsequent to the filing of this appeal, the charter review commission ap-

pointed by the town council recommended twenty-one amendments to the town charter. The town council proceeded to submit these recommendations to the electorate in the November 2008 election. The voters approved approximately 77 percent of the proposed amendments.

or needlessly added.'" *Id.* "[W]e must 'presume the language was carefully weighed and its terms imply a definite meaning.'" *Id.*

■ The historical context of a constitutional provision also is important in ascertaining its meaning, scope and effect. *Riley,* 941 A.2d at 205; *see also In re Advisory Opinion to the Governor,* 688 A.2d 288, 291 (R.I.1997) ("a page of history is worth a volume of logic") (quoting Justice Oliver Wendell Holmes in *New York Trust Co. v. Eisner,* 256 U.S. 345, 349, 41 S.Ct. 506, 65 L.Ed. 963 (1921)). Thus, this Court may properly consult extrinsic sources, including "the history of the times" and the "state of affairs as they existed" when the constitutional provision in question was adopted, as well as the proceedings of constitutional conventions. *Sundlun,* 662 A.2d at 45.

### III

### Discussion

The state constitution was amended in 1951 to grant home rule to the state's municipalities.[3] *Amico's Inc. v. Mattos,* 789 A.2d 899, 903 (R.I.2002); *see generally* Terrence P. Haas, Note, *Constitutional Home Rule in Rhode Island,* 11 Roger Williams U.L.Rev. 677 (2006). Traditionally, municipalities were considered mere creatures of the state and "had no inherent right to self-government." *Amico's Inc.,* 789 A.2d at 903 (citing *Lynch v. King,* 120 R.I. 868, 876, 391 A.2d 117, 122 (1978) and *City of Providence v. Moulton,* 52 R.I. 236, 246, 160 A. 75, 79 (1932)). The home-rule amendment to the constitution "altered this traditional view by empowering cities and towns to legislate with re-

gard to all local matters." *Id.* at 903 (quoting *Lynch,* 120 R.I. at 876, 391 A.2d at 122). With the passage of the home-rule amendment, the state relinquished a portion of its legislative authority to municipalities. *See* R.I. Const. art. 13, sec. 1 ("It is the intention of this article to grant and confirm to the people of every city and town in this state the right of self government in all local matters."); R.I. Const. art. 13, sec. 2 ("Every city and town shall have the power at any time to adopt a charter, amend its charter, enact and amend local laws relating to its property, affairs and government not inconsistent with this Constitution and laws enacted by the general assembly in conformity with the powers reserved to the general assembly."). Under this grant of authority, the town adopted a charter in 1968. *See* Town of Middletown Charter, Editor's note.

Sections 6, 7 and 8 of the home-rule provisions of the state constitution detail the process for the adoption and amendment of a town charter. Section 6 provides for the creation of a charter commission. It states that whenever 15 percent of a municipality's qualified electors sign and submit a petition for the adoption of a charter to the local legislative body, the legislative body must submit to the qualified electors the following question: "Shall a commission be appointed to frame a charter?" At the same time, the legislative body must provide for the election of a charter commission. The people must be given the opportunity to elect nine commissioners through an at-large election without party or political designation. Section 7 then provides that within one year of the election of a charter commis-

---

**3.** The constitutional convention of 1986 moved the home-rule amendment from article 28 of the amendments to the Rhode Island Constitution to article 13, where it remains today. *In re Advisory Opinion to the House of* *Representatives,* 628 A.2d 537, 538 (R.I.1993); *see* Terrence P. Haas, Note, *Constitutional Home Rule in Rhode Island,* 11 Roger Williams U.L.Rev. 677, 693 (2006). No substantive changes were made.

sion, the commission shall frame and submit a charter to the municipal legislative body. The city or town's legislative body next must provide for the publication of the new charter and submit it to the voters for approval at the next general election. Majority approval is required for the charter to become effective.

Section 8 of article 13 details the process for amending a local charter. It provides that the legislative body of a city or town may propose amendments. Those amendments are to be submitted for approval in the same manner as provided for the adoption of a charter—meaning, that the legislative body must provide for the publication of those amendments and submit them to the voters for majority approval at the next general election, as is required in section 7.

■ In examining the above cited sections of article 13, we conclude that the home-rule provisions of the state constitution contemplate only one way of changing a charter when one has been adopted, and that is through the amendment process of section 8. The voter-initiated petition process is a procedure available to a city or town only for the initial adoption of a charter. We ground this conclusion in the language of the constitutional provisions and the intent of the framers of the home-rule amendment.

■ We read sections 6 and 7 as creating a procedure for the *establishment* of home rule in a city or town—a monumental break from the exclusive authority of the General Assembly. Section 6 grants a municipality the power to *adopt* a charter. "[T]his Court has consistently understood 'adopt' to mean 'create,' 'develop,' and 'enact.'" *In re Advisory Opinion to the Governor*, 612 A.2d 1, 8 (R.I.1992). Section 6 requires that, upon the filing of an adequate petition, the legislative body of the municipality must ask the qualified electors whether "a commission be appointed to *frame* a charter." (Emphasis added.) This choice of a town or city to detach itself from the top-down control of the state and engage in self-government on local matters is a one-time occurrence— a fundamental change in the form and structure of local government.[4] The framers of the home-rule provisions based their constitutional amendment on the premise that a city or town only decides to employ home rule once, and remains self-governed thereafter. *See generally Proceedings of the Limited Constitutional Convention of the State of Rhode Island* (Evening Session, June 2, 1951) (*1951 Convention Pro-*

---

4. Although we appreciate our dissenting colleague's respect for the ordinary meaning of the word "whenever," we cannot agree that its meaning within the context of article 13, section 6 is as pellucid as he suggests. *See* R.I. Const. art. 13, sec. 6 ("Every city and town shall have the power to adopt a charter in the following manner: Whenever a petition for the adoption of a charter signed by fifteen percent of the qualified electors * * *."). We do not construe the act of adopting a charter to be a recurring event. The word "whenever" is necessary, however, because the filing of a petition may not lead to the adoption of a charter—such as in the situation when the qualified electors decide not to appoint a commission or do not approve of the charter so framed by the commission.

Although perhaps not as skilled in the King's English as Joyce Kilmer, Johnny Cash once wrote of a saddle tramp nearing the end of his trail:

"Whenever I die take my saddle from the wall /
Strap it on snuffy lead him out of the stall /
Throw me on his back and turn him toward the west /
He knows how to take me to the spot I love best." Johnny Cash,
*Slow Rider*, on Ride This Train (Columbia/Legacy 1960).
Surely Cash's soulful cowboy did not view his impending death as a recurring event.

*ceedings* ); *see id.* at 128 (statement of William J. Thompson) ("[This amendment] allows the people to *initiate* home rule without seeking permission from the State Legislature * * *.") (emphasis added).

▌ Significantly, the framers did not mention revision, repeal or replacement of a charter—not in section 6, nor anywhere else in article 13. Rather, the framers provided only for the amendment of charters once adopted. Specifically, section 8 provides that "[t]he *legislative body* of any city or town may propose amendments." (Emphasis added.) We conclude that the word "amendment" in section 8 encompasses any and all changes to a charter once adopted, even substantial change. While we have not had occasion to define the word "amend" or "amendment," these words are commonly defined as the act of changing for the better, a correction or alteration, or the process of formally altering by modification, deletion or addition. *See* The American Heritage Dictionary of the English Language 57–58 (4th ed.2000); *see also* Webster's II New College Dictionary 36 (2001). These definitions do not limit the word to partial changes.

Furthermore, it was clear at the 1951 Constitutional Convention that the home-rule resolution adopted was intended to "permit[ ] the governing body of any city or town alone to propose amendments." *1951 Convention Proceedings* at 131 (statement of Harold R. Smith). In fact, one delegate to the convention unsuccessfully proposed a resolution that would have allowed qualified electors to petition for amendment of a charter. *See id.* Instead, under article 13, as enacted, the people of a city or town who wish to propose modifications to an existing charter can act only indirectly, through their elected representatives. We understand,

> "[t]he Town Council still remains answerable to the public * * * through a

variety of forums. The people of the Town are able to voice their questions and concerns by petitioning the Town Council for grievances and/or attending public hearings on town matters. Most importantly, the people of the Town retain the power to take to the ballot boxes every two years and express, if necessary, their displeasure with their Town Council." *Newport Court Club Associates v. Town Council of Middletown,* 800 A.2d 405, 417 (R.I.2002).

In a nonbinding advisory opinion, five justices of this Court declared that " '[o]nce a home rule charter has been duly adopted by the qualified electors of a city or town in accordance with the provisions of article [13] of the amendments, it may be amended only as provided in said article.' " *Opinion to the House of Representatives,* 99 R.I. 472, 475, 208 A.2d 522, 523 (1965) (quoting *Opinion to the House of Representatives,* 79 R.I. 277, 283, 87 A.2d at 693, 697 (1952)). They explained that the General Assembly did not have the authority, after the home rule amendments, to submit automatically to the qualified electors of a city or town, every six years, the question of whether a commission should be appointed to amend, alter or revise their local charter. *Id.* They reasoned that this proposed act "would establish a different method for amending the charter of a municipality without following the procedure prescribed in sec. 8." *Id.* Although the justices were responding to a question concerning the status of the state legislature relative to the home-ruled municipality, not with the relationship between the people and their local government, this language nonetheless indicates that the adoption of a municipal charter is a one-time event and that there is only one way a charter can be changed thereafter.[5] *See id.*

---

5. Most home rule questions that have come
before this Court involve the allocation of

■ Accordingly, we hold that once a town or city has adopted a charter pursuant to the home rule provisions of article 13 of the Rhode Island Constitution, the charter can be modified only by amendment pursuant to section 8.

## IV

## Conclusion

For the reasons stated in this opinion, we affirm the judgment of the Superior Court. We remand the papers in this case thereto.

ROBINSON, J., dissenting.

While the result reached by the Court might meet with my approval if I were sitting as a delegate to a constitutional convention, my judicial role requires me to focus on what the language of the constitutional provision at issue *actually says.* From that perspective, I cannot agree with the Court's reading of what I consider to be the clear language of article 13 of the Rhode Island Constitution. Therefore, I respectfully dissent.

I have read article 13 of our Constitution over and over again, and each time I have been struck by the following pellucid language in section 6 of that article:

> "*Whenever* a petition for the adoption of a charter signed by fifteen percent of the qualified electors of a city, or in a town by fifteen percent, but not less than one hundred in number, of those persons qualified to vote on any proposition to impose a tax or for the expenditure of money shall be filed with the legislative body of any city or town the same shall be referred forthwith to the canvassing authority which shall within ten days after its receipt determine the sufficiency thereof and certify the results to the legislative body of said city or town." (Emphasis added.)

To my mind, the word "whenever" in the foregoing passage unequivocally indicates that the charter adoption process provided for in section 6 of article 13 need not necessarily be a one-time phenomenon in the history of any particular city or town. I view the word "whenever" in section 6 of article 13 as being as crucial to the resolution of this case as the word "now" was in the eyes of the United States Supreme Court when it very recently decided the case of *Carcieri v. Salazar,* —— U.S. ——, 129 S.Ct. 1058, 172 L.Ed.2d 791 (2009).[6]

power between the state and the municipality and are irrelevant to the matter before us. *See, e.g., Newport Court Club Associates v. Town Council of Middletown,* 800 A.2d 405, 410 (R.I.2002) (holding that once a town has adopted a home rule charter, the state legislature "may not enact special legislation affecting a local matter in that particular town unless the legislation is approved by a majority of the qualified electors of the town"); *Amico's Inc. v. Mattos,* 789 A.2d 899, 903 (R.I.2002) (holding that "municipalities may not legislate on matters of statewide concern, and the power of home rule is subordinate to the General Assembly's unconditional power to legislate in the same areas"); *Town of East Greenwich v. O'Neil,* 617 A.2d 104, 111 (R.I. 1992) (holding that although cities and towns that have adopted home-rule charters may exercise authority over purely local matters,

municipalities may not legislate on issues of statewide concern because the state legislature retains exclusive power in those areas) (citing *Westerly Residents for Thoughtful Development Inc. v. Brancato,* 565 A.2d 1262, 1264 (R.I.1989)); *Opinion to the House of Representatives,* 79 R.I. 277, 279–80, 87 A.2d 693, 695–96 (1952) (explaining how the initial adoption of a home-rule charter changes the status of a city or town relative to the General Assembly).

**6.** In considering this constitutional language, I could not help but recall the following lines from Joyce Kilmer's poem *The House With Nobody In It* that we were required to memorize in grammar school:

> "Whenever I walk to Suffern along the Erie track

As I read it, there is absolutely no ambiguity in the above-quoted language from our constitution. Therefore, pursuant to this Court's well-established norms, I must look for and apply the ordinary meaning of the word "whenever." *See, e.g., City of Pawtucket v. Sundlun,* 662 A.2d 40, 45 (R.I.1995) (referring to "the well-established rule of construction that when words in the constitution are free of ambiguity, they must be given their plain, ordinary, and usually accepted meaning"); *Bailey v. Baronian,* 120 R.I. 389, 391, 394 A.2d 1338, 1339 (1978) ("In construing constitutions, our chief purpose is to give effect to the intent of the makers. * * * Ordinary words are to be given their usually accepted meaning, and we must presume the language was carefully weighed and that its terms imply a definite meaning."); *see also Riley v. Rhode Island Department of Environmental Management,* 941 A.2d 198, 205 (R.I.2008).

The Home Rule amendments were first ratified by the voters of this state in 1951. The then-current edition of Webster's New International Dictionary defined "whenever" as "[a]t any or all times that; in any or every instance in which * * *." Webster's New International Dictionary 2910 (2nd ed.1935). Ten years after the amendment's adoption, the next edition of Web-

ster's New International Dictionary included an identical definition. *See* Webster's Third New International Dictionary 2602 (1962). More recent definitions are likewise similar. *See, e.g.,* Merriam–Webster Online Dictionary (retrieved June 5, 2009, from http://www.merriam-webster.com/dictionary/whenever) (defining "whenever" as "at any or every time that"); The Random House Dictionary of the English Language 2164 (2nd ed.1987) (defining "whenever" as "at whatever time; at any time when"); American Heritage Dictionary of the English Language 1458 (1969) (defining "whenever" as "[a]t whatever time that * * * [e]very time that").[7] Other courts which have had occasion to construe the meaning of the word "whenever" have settled on similar definitions. *See, e.g., Bethlehem Steel Corp. v. United States Environmental Protection Agency,* 723 F.2d 1303, 1306 (7th Cir.1983) ("[A]s used in the sentence, 'whenever' seems to mean 'in any or every instance in which'—a common usage of the word * * *.").

In light of these definitions and bearing in mind the context of the constitutional provision at issue, I conclude that, if the word "whenever" occurs in a sentence or clause referring to an act that is intrinsically capable of multiple iterations, then "whenever" means "at any time that."[8]

> I go by a poor old farmhouse with its shingles broken and black.
> I suppose I've passed it a hundred times, but I always stop for a minute
> And look at the house, the tragic house, the house with nobody in it."

I am confident that the average English-speaking reader of the first two above-quoted lines from the Kilmer poem would understand the poet to be indicating that he was accustomed to walk to Suffern with some degree of regularity; to my mind that is the plain sense conveyed by the word "whenever" with which the poem begins. And I likewise understand it to be the plain sense conveyed by that word as it is used in section 6 of article 13 of the Rhode Island Constitution.

**7.** I do not focus on the word "whenever" in a myopic, non-contextual manner. I am mindful of the danger in making a "fortress out of the dictionary." *See Cabell v. Markham,* 148 F.2d 737, 739 (2nd Cir.1945) (Learned Hand, J.). I am confident, however, that my reading of the term "whenever" as used in section 6 of article 13 of the Rhode Island Constitution fully comports with its constitutional context.

**8.** I realize that there are some discrete contexts in which the word "whenever" does not suggest the possibility of a multiplicity of occurrences. (*E.g.,* "I will shovel the snow off the sidewalk whenever I get home tonight."). However, the use of the word in section 6 of article 13 unambiguously indicates to me that

In so concluding, I note that the term "whenever" appears elsewhere in our constitution. Indeed, I consider the "whenever" that is at issue in this case to have exactly the same meaning that it does in section 3 of article 10 of the Rhode Island Constitution:

> "The judges of the supreme court shall give their written opinion upon any question of law *whenever* requested by the governor or by either house of the general assembly." (Emphasis added.)

I do not believe that the average English-speaking person would contend, on the basis of this provision, that the judges of this court are required to give an advisory opinion on only one occasion. The justices of this Court are constitutionally obliged to answer properly propounded requests for advisory opinions from the coordinate branches; and the fact is that they have done so on multiple occasions, always acting pursuant to section 3 of article 10.[9] Likewise, I see nothing in section 6 of article 13 that even remotely indicates that a community may adopt a charter only once. Indeed, it seems to me that it is arguably an "absurd" result to attribute to the drafters of the Constitution the intention of allowing one generation to adopt a charter while leaving succeeding generations powerless to fundamentally reimagine their form of government. *See Chambers v. Ormiston*, 935 A.2d 956, 963 n. 15 (R.I.2007).

I do not believe that my construction of the constitutional provisions at issue will give free rein to the Thomas Wilson Dorrs[10] or the Jack Cades[11] of this world. It should be borne in mind in this regard

that, even if fifteen percent of the electorate should cause the issue of convening a new charter commission (*vel non*) to go before the electorate, the electorate would remain free to reject the proposal—perhaps even resoundingly.

In addition, I feel compelled to record my disagreement with the Court's reliance on fragments from the minutes of the 1951 Constitutional Convention. *See McGee v. Stone*, 522 A.2d 211, 216 (R.I.1987) ("We determine legislative intent through an examination of the language of the statute itself, giving the words of the statute their plain and ordinary meaning."). To my mind, there is no need in this instance to ruminate about what may have been the *intent* of the drafters of the home rule amendment or those who voted for it. As this Court quite recently stated in the case of *McKenna v. Williams*, 874 A.2d 217, 232 (R.I.2005):

> "Constitutions, just like statutes, have an effect *by what they say*. When a constitutional provision is clear, it speaks for itself. In the face of a clear constitutional provision (assuming it does not lead to absurd results), it is not necessary to anguish over what might have been the intent of the electorate." (Emphasis in original.)

We are left with the plain language of the amendment. But that is not nothing. *See* Robert Bolt, A Man for All Seasons, act 2 ("It will mean what the words say! An oath is *made* of words!").

For these reasons, I respectfully dissent.

---

the process described in that section could be set in motion more than once in any given municipality.

**9.** *See Opinion to the Governor*, 93 R.I. 262, 265, 174 A.2d 553, 554 (1961).

**10.** *See generally Luther v. Borden*, 48 U.S. (7 How.) 1, 12 L.Ed. 581 (1849).

**11.** Jack Cade was the leader of a revolt of peasants in Kent in the year 1450.