Woonsocket School Committee et al.     :

v.                 :

The Honorable Lincoln Chafee in his official   :
capacity as the Governor of the State of Rhode
Island et al.

NOTICE:    This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Woonsocket School Committee et al.  :

v.  :

The Honorable Lincoln Chafee in his official  :
capacity as the Governor of the State of Rhode
Island et al.

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Chief Justice Suttell, for the Court.** Few responsibilities of government are as important as providing for the education of children; few issues are as passionately debated by citizens as the appropriate way to meet that responsibility. This case concerns the parameters of the General Assembly's duty to promote public education, which is set forth in the Education Clause, article 12, section 1 of the Rhode Island Constitution. Specifically, the plaintiffs challenge the legislatively enacted school funding formula, which, they allege, fails to allocate adequate resources to less affluent communities. These plaintiffs maintain that said formula, together with a confluence of statutory mandates, Rhode Island Department of Education regulations, educational standards, and the low tax capacity of certain urban municipalities, operate to inhibit students in their respective cities from obtaining a quality education.

The plaintiffs in this case are the Woonsocket and Pawtucket School Committees and their respective Superintendents, and unnamed students enrolled in Woonsocket and Pawtucket public schools, as well as their unnamed parents (collectively, plaintiffs). These various plaintiffs brought suit against the legislative and executive branches of Rhode Island's state government, specifically: the Governor, the Senate President, the Speaker of the House of

- 1 -

Representatives, the General Assembly, and the State Treasurer (collectively, defendants).  The

plaintiffs sought injunctive and declaratory relief, alleging violations of the Education Clause as

well as of their substantive due process and equal protection rights.  The plaintiffs now appeal

from the Superior Court's order granting defendants' motion to dismiss the complaint.  For the

reasons set forth herein, we affirm the order of the Superior Court.

## I

### Facts and Procedural History

The causes of action currently before this Court for review are set forth in plaintiffs'

eighty-one-page, 537-paragraph "second amended petition" (the complaint), which was filed on

April 8, 2011.  Due to the detail and length of this pleading, we shall only outline the factual

allegations asserted therein.[1]

The complaint begins with a summary of the origins of public education in Rhode Island.

The plaintiffs assert that each city and town in Rhode Island contained at least one public school

by the end of the eighteenth century and that the General Assembly began legislating in this

arena in 1828.  The plaintiffs note that Rhode Island's Constitution of 1842[2] included an

education clause, article 12, section 1, which read as follows:

> "The diffusion of knowledge, as well as of virtue among the
> people, being essential to the preservation of their rights and
> liberties, it shall be the duty of the general assembly to promote
> public schools, and to adopt all means which they may deem
> necessary and proper to secure to the people the advantages and
> opportunities of education."

---

[1] As we rest our opinion upon the Education Clause, we shall not address plaintiffs' compliance
with Rule 8(a) of the Superior Court Rules of Civil Procedure, commanding that a pleading
contain "a short and plain statement of the claim."
[2] The 1842 Constitution replaced the Royal Charter of 1663, granted by Charles II, as the state's
organic law.  The Constitution was ratified in November 1842, in the aftermath of the Dorr
Rebellion, and it became effective in May 1843.  We shall refer to it as the 1842 Constitution.

The plaintiffs assert that "[i]n the decades that followed [the 1842 Constitution] the General Assembly established, as a matter of state law, that public schools would be available to all at no charge." The General Assembly enacted compulsory school attendance laws beginning in 1893, with various additions and changes to these laws continuing through 2007. The complaint outlines the creation of the State Board of Education in 1870, the subsequent regulation of teachers, and the creation of high schools.

The plaintiffs allege that "[i]n 1960, the General Assembly sought to systematically define all of the elements of an appropriate education" and passed laws that required school districts to ensure a sufficient budget to support this basic educational program. The General Assembly delegated to the Board of Regents for Elementary and Secondary Education (Board of Regents) the responsibility of defining the mandated minimum program, and the Board of Regents in turn directed the Rhode Island Department of Education (RIDE) to prepare a Basic Education Program Manual (BEP Manual) in the 1980s. The BEP Manual set forth a basic educational program that was to be available to each student, regardless of where in the state the student attended school.

The plaintiffs next address how the General Assembly has "codified a series of minimum mandatory performance standards in core subjects that each child in Rhode Island must attain." Pursuant to 1997 legislation (P.L. 1997, ch. 30, Art. 31, codified at G.L. 1956 chapter 7.1 of title 16) referred to as "Article 31," the General Assembly directed the Board of Regents to develop an assessment program in order to measure students' educational progress against a standard of "proficiency." In 2001, the federal "No Child Left Behind Act" also required states to develop plans that incorporated challenging academic standards into the content of each student's education. In response to Article 31 and the No Child Left Behind Act, the Board of Regents

created grade-level standards for all Rhode Island students in the core subjects of reading, written and oral communication, mathematics, science, and civics. Between 2003 and 2008, the Board of Regents enacted "literacy regulations," which included high-school graduation requirements, statewide curricula, English-language-learner regulations, and regulations aimed at reducing high-school dropout rates.

Rhode Island also adopted the New England Common Assessment Program (NECAP), which is a yearly standardized test that assesses all students in reading, mathematics, and writing, with selected grades assessed in science. The NECAP tests measure children's content knowledge against RIDE's standards for what each student should know according to his or her grade level. NECAP scores are classified into four levels: proficient with distinction, proficient, partially proficient, and substantially below proficient.

In 2009, the Board of Regents promulgated revisions to the BEP Manual, requiring school districts to "provide a comprehensive program of study in English language arts, mathematics, social studies, the sciences, visual arts & design and the performing arts, engineering and technology, comprehensive health, and world language throughout the PK-12 system." In January 2011, RIDE promulgated a draft set of proposed revisions to its 2008 high-school regulations, which articulated specific high-school graduation requirements. These requirements provided in part that, beginning with the class of 2012, students would be required to achieve NECAP scores of "partially proficient" in order to earn a diploma. After teachers and students expressed concern that the diploma requirements would harm the future of children unable to attain a sufficiently high score on the NECAP assessments, the Board of Regents approved a revised regulation that postponed the NECAP assessment graduation requirement until the class of 2014.

In the next section of their complaint, plaintiffs address the lack of parity between educational standards and funding. The plaintiffs express support for the policies of RIDE and the Board of Regents aimed at "enact[ing] minimum education program standards for all of Rhode Island's children"; plaintiffs' claim for judicial relief centers on "the General Assembly's failure to allocate adequate resources to permit the realization of those standards." The plaintiffs assert that, beginning in 1991, the General Assembly's funding policy has "lack[ed] a rational relationship to community need, and ha[s] increased the burdens on urban communities to an unsustainable level, depriving them of the resources needed to educate their children to the minimum level mandated by the State."

The plaintiffs begin this portion of the complaint with a discussion of the "1960 funding formula," which provided for school districts to set their own budgets, with the state paying a proportion (the "share ratio") of these budgets based on each district's relative property-tax wealth per student. This funding formula was titled the "operations aid" program. The formula was amended in 1967 and 1988 to increase the state's share of funding; in 1991, however, the state failed to provide full funding for the operations aid program and imposed a reduction of $26.3 million pro rata among the districts.[3] The plaintiffs assert that the operations aid funding from 1997 through 2005 "was not proportionate to a district's student population, relative wealth, or any measurable criterion" and that, "[b]y 2004-5, the state share for education remained at 43%, one of the seven lowest in the country."

In 1995, the General Assembly enacted the "Caruolo Act" (P.L. 1995, ch. 173, § 1), codified at G.L. 1956 § 16-2-21.4, which "created a remedy in Superior Court for school districts

---

[3] In response to this reduction, the municipalities of Pawtucket, Woonsocket, and West Warwick brought suit against the state, seeking to remedy disparities in the school funding system. The plaintiffs in that case prevailed in the Superior Court, but the judgment was reversed on appeal. See City of Pawtucket v. Sundlun, 662 A.2d 40 (R.I. 1995), discussed infra.

to sue municipal governments when the schools lacked adequate resources to provide the minimum education required under the [BEP Manual]." The plaintiffs allege, however, that the Caruolo Act could not achieve its purported goal of vindicating children's rights to adequately funded education because communities such as Woonsocket and Pawtucket "simply lack[] the capacity to raise sufficient local funds to provide a quality education program for [their] children."

In 2006, the General Assembly enacted the "Paiva-Weed Act" (P.L. 2006, ch. 253, § 5), amending § 16-2-21, which "placed limits on annual increases in municipal taxes." The plaintiffs assert that the Paiva-Weed Act placed an initial cap of 5.5 percent on municipal taxes in 2006, with a scheduled cap of 4 percent in 2012-2013. The plaintiffs allege that, pursuant to the Paiva-Weed Act, "school departments are forbidden even to request from their municipalities any local contributions in the excess of a specified percentage increase." Further, "[t]he Paiva-Weed Act required courts to 'consider the percentage caps on school district budgets * * *' when issuing a decree granting relief under the Caruolo Act."

The General Assembly enacted a new educational funding formula in 2010, which, according to plaintiffs, "fails to provide adequate resources to allow children, especially in poor, urban communities, to obtain a quality education that provides a reasonable opportunity for each child to meet the academic standards established by RIDE." The 2010 funding formula allocates costs between the local communities and the state based on a mathematical ratio that considers each community's relative share of property value per pupil and median family income. The plaintiffs assert that the 2010 formula harms communities with weak property-tax bases, such as Pawtucket and Woonsocket. Furthermore, the General Assembly chose to implement the 2010 funding formula over a period of years, meaning that "it will be a long time before underfunded

communities, including Pawtucket and Woonsocket, receive State aid that is adequate even under the General Assembly's flawed methodology."

The plaintiffs devote the next portion of their complaint to a description of the educational consequences of the General Assembly's inadequate funding formulas. They assert that "[a]s a result of the General Assembly's commendable action to establish minimum standards, the Woonsocket and Pawtucket school committees are faced with increasing funding requirements," and yet they "lack the resources to meet these standards." Specifically, plaintiffs assert that the 2008-2009 NECAP scores for Woonsocket's and Pawtucket's elementary, middle, and high-school students were woefully below state averages and showed extremely low levels of proficiency in reading, writing, mathematics, and science. The NECAP scores also showed an achievement gap between white and nonwhite students, and the schools were unable to comply with the Board of Regents' regulations governing educational programs for students learning English as a second language. The state has classified some of these schools as making "insufficient progress" for failing to meet academic targets in core subject areas.

The plaintiffs assert that all schools in Woonsocket and Pawtucket are mandated pursuant to state regulations to provide additional support for students whose reading and mathematics proficiency is below grade level; however, the schools lack the funding necessary to comply with these mandates. The schools also suffer from inferior facilities and a lack of adequate materials. For example, plaintiffs assert that Pawtucket's Shea High School has unmanageable climate control, mold problems, leaks, broken windows, and science labs lacking running water or gas. While the school enrolls children from fifty different countries who speak twenty-five different languages, it has only one translator. The school's social studies textbooks end with the Clinton presidency, and the school runs out of paper part way through the academic year. The plaintiffs

assert that if the Board of Regents' regulations come into effect, imposing NECAP scores of partially proficient as a graduation requirement, 64 percent of Shea High School's students will not qualify for a diploma.

The plaintiffs assert that "[t]he lack of educational opportunities available to children in Rhode Island's urban communities, including Woonsocket and Pawtucket, contribute significantly to the State's position of having some of the lowest performing public schools in the country."

Count 1 of plaintiffs' complaint alleges a violation of the Education Clause, article 12, section 1 of the Rhode Island Constitution. The plaintiffs assert that the General Assembly has "enacted minimum academic standards that apply to all children in Rhode Island" pursuant to its constitutional duty to promote public schools. According to plaintiffs, "the General Assembly has repeatedly failed to provide adequate resources to implement those standards, even while recognizing this inadequacy and articulating many viable solutions." The plaintiffs assert that the Paiva-Weed Act "prevent[s] municipal governments from providing sufficient local resources" and limits the Caruolo Act in such a way that "compromise[s] the ability of school districts to ensure a proper allocation of local resources to educate children, especially in a time of inadequate State resources."

Count 2 sets forth the language of article 1, section 2 of the Rhode Island Constitution[4] and alleges that "[p]laintiffs have a substantive due process right to public education," which has

_____

[4] Article 1, section 2 of the Rhode Island Constitution provides:
    "Laws for good of whole — Burdens to be equally distributed — Due process — Equal protection — Discrimination — No right to abortion granted. — All free governments are instituted for the protection, safety, and happiness of the people. All laws, therefore, should be made for the good of the whole; and the burdens of the state ought to be fairly distributed among its citizens. No person

"been denied * * * due to the General Assembly's failure to provide adequate school aid." This count also sets forth the language of article 1, section 5 of the Rhode Island Constitution.[5] Although count 2 is titled "Substantive Due Process," the hearing justice found that plaintiffs were "also alleging violations of equal protection," because article 1, section 2 refers to both due process and equal protection, and because plaintiffs' prayer for relief states a deprivation of the right to equal treatment under the law.

Count 3 of plaintiffs' complaint was withdrawn by agreement of the parties. Count 4 asserts a claim for injunctive relief, and count 5 presents a general assertion that the 2010 funding formula is inadequate to meet the needs of the children of Woonsocket and Pawtucket. Count 5 also asserts that allocations of state aid to Pawtucket and Woonsocket in 2010-2011 and 2011-2012 are inadequate according to the definition of adequacy contained in the 2010 funding formula.[6]

In their prayer for relief, plaintiffs seek: (1) a declaration that the student plaintiffs have a right to receive an adequate education pursuant to article 12 and the Rhode Island General Laws;

---

shall be deprived of life, liberty or property without due process of law, nor shall any person be denied equal protection of the laws. No otherwise qualified person shall, solely by reason of race, gender or handicap be subject to discrimination by the state, its agents or any person or entity doing business with the state. Nothing in this section shall be construed to grant or secure any right relating to abortion or the funding thereof."

[5] Article 1, section 5 of the Rhode Island Constitution provides:

"Entitlement to remedies for injuries and wrongs — Right to justice. — Every person within this state ought to find a certain remedy, by having recourse to the laws, for all injuries or wrongs which may be received in one's person, property, or character. Every person ought to obtain right and justice freely, and without purchase, completely and without denial; promptly and without delay; conformably to the laws."

[6] The hearing justice analyzed counts 1 and 5 as one claim, because they both implicate the General Assembly's authority to regulate public education financing.

(2) a finding that the present system of education financing deprives plaintiffs of their right to an adequate education; (3) a finding that the present system of education financing systematically deprives plaintiffs of their right to equal treatment under the law in violation of article 1, section 2; (4) a finding that the Paiva-Weed Act places unconstitutional restrictions on the ability of communities to raise local taxes for public education; (5) a declaration that the 2010-2011 through 2016-2017 allocations of aid to Pawtucket and Woonsocket are inadequate according to the 2010 funding formula; (6) an injunction against further constitutional violations; (7) an injunction directing defendants to devise and implement a funding program that complies with constitutional standards; and (8) attorneys' fees and costs.

The defendants moved to dismiss plaintiffs' complaint pursuant to Rules 12(b)(1)[7] and 12(b)(6) of the Superior Court Rules of Civil Procedure. Specifically, defendants argued that this Court's decision in City of Pawtucket v. Sundlun, 662 A.2d 40 (R.I. 1995), bars relitigation of the constitutionality of the General Assembly's decisions regarding school funding, and that the issue presented is a nonjusticiable political question—the consideration of which would constitute a violation of the separation of powers doctrine.[8] Hearings were held on April 24, 2012 and June 19, 2012, and the hearing justice issued a thirty-one-page decision granting defendants' motion on July 12, 2012. Judgment for defendants was entered on July 19, 2012, and plaintiffs filed a timely notice of appeal.

---

[7] The issue of subject matter jurisdiction is not presented on appeal.

[8] The defendants also argued that plaintiffs' complaint did not contain a short and plain statement of a claim as required by Rule 8 and that the Caruolo Act is the exclusive remedy for school committees seeking additional funding. The hearing justice did not reach these issues in her decision. Because we now find that plaintiffs' complaint fails to state a claim upon which relief may be granted, we too need not address these issues. Additionally, defendants argued below that the school committees lacked standing and that necessary and indispensable parties were absent from the dispute. The hearing justice's findings with regard to these issues are not challenged on appeal.

## II

### Standard of Review

"In reviewing the grant of a motion to dismiss pursuant to Rule 12(b)(6), this Court applies the same standard as the hearing justice." Mendes v. Factor, 41 A.3d 994, 1000 (R.I. 2012) (quoting Barrette v. Yakavonis, 966 A.2d 1231, 1233 (R.I. 2009)). "Because 'the sole function of a motion to dismiss is to test the sufficiency of the complaint,' our review is confined to the four corners of that pleading." Id. (quoting Barrette, 966 A.2d at 1234). We will "assume[] the allegations contained in the complaint to be true and view[] the facts in the light most favorable to the plaintiffs." Rhode Island Employment Security Alliance, Local 401, S.E.I.U., AFL-CIO v. State, Department of Employment and Training, 788 A.2d 465, 467 (R.I. 2002) (quoting St. James Condominium Association v. Lokey, 676 A.2d 1343, 1346 (R.I. 1996)). "A motion to dismiss is properly granted 'when it is clear beyond a reasonable doubt that the plaintiff would not be entitled to relief from the defendant under any set of facts that could be proven in support of the plaintiff's claim.'" Mendes, 41 A.3d at 1000 (quoting Barrette, 966 A.2d at 1234).

## III

### Discussion

### A

### The Education Clause

The outcome of this case largely depends on our interpretation of the Education Clause, article 12, section 1 of the Rhode Island Constitution, which reads as follows:

> "Duty of general assembly to promote schools and libraries. — The diffusion of knowledge, as well as of virtue among the people, being essential to the preservation of their rights and liberties, it shall be the duty of the general assembly to

promote public schools and public libraries, and to adopt all means which it may deem necessary and proper to secure to the people the advantages and opportunities of education and public library services."

When confronted with an issue of constitutional interpretation, "this Court's 'chief purpose is to give effect to the intent of the framers.'" Viveiros v. Town of Middletown, 973 A.2d 607, 610 (R.I. 2009) (quoting Riley v. Rhode Island Department of Environmental Management, 941 A.2d 198, 205 (R.I. 2008)). "We 'employ the well-established rule of construction that when words in the constitution are free of ambiguity, they must be given their plain, ordinary, and usually accepted meaning.'" Id. (quoting Riley, 941 A.2d at 205). Furthermore, "'[e]very clause must be given its due force,' meaning 'no word or section must be assumed to have been unnecessarily used or needlessly added.'" Id. at 610-11 (quoting Riley, 941 A.2d at 205). "[W]e must 'presume the language was carefully weighed and its terms imply a definite meaning.'" Id. at 611 (quoting Riley, 941 A.2d at 205).

We will also look to the "historical context of a constitutional provision" when "ascertaining its meaning, scope and effect." Viveiros, 973 A.2d at 611. "Thus, this Court may properly consult extrinsic sources, including 'the history of the times' and the 'state of affairs as they existed' when the constitutional provision in question was adopted, as well as the proceedings of constitutional conventions." Id. (quoting Sundlun, 662 A.2d at 45).

### 1. City of Pawtucket v. Sundlun

In Sundlun, 662 A.2d at 42, we had the opportunity to review and interpret article 12, section 1, in order to determine "the means by which the General Assembly fulfills its constitutional mandate to provide public education * * * ." Sundlun was a case initiated by students, taxpayers, and government representatives from three Rhode Island communities, including Pawtucket and Woonsocket, who objected to the state's 1991 appropriation for

- 12 -

elementary and secondary education. Id.  The plaintiffs asserted that "the state's method of funding public education was violative of the Rhode Island Constitution"; they asked the court to direct defendants, who included the Governor, the Speaker of the House of Representatives, and the President Pro Tempore of the Senate, "to devise, enact, and implement a system of aid to education that would fairly levy the taxes necessary to provide equal educational opportunities to students and that would assign educational resources as uniformly as was practical." Id. at 43. The case was tried in Superior Court, and the trial justice issued a judgment declaring that the school finance system violated the Education Clause as well as the Equal Protection and Due Process Clauses of the Rhode Island Constitution. Id. at 43.

We reversed that decision on appeal, rejecting the Superior Court's finding that the Education Clause provides a "fundamental and constitutional right for each child to * * * an opportunity to receive an equal, adequate, and meaningful education." Sundlun, 662 A.2d at 55, 63.  We perceived that the trial justice's interpretation of the Education Clause "contradict[ed] the historical record and the express language of article 12" and "fail[ed] to recognize the role of the Judiciary in our tripartite system of government." Id. at 55.

In explaining our decision in Sundlun, 662 A.2d at 45-49, we set forth a detailed historical context for article 12, section 1.  After reviewing the statutory and constitutional development of public education in Rhode Island, we concluded that, "given the context of the times in which it was adopted, article 12, section 1, does not appear to have imposed on the General Assembly any new, measurable, or judicially enforceable duties to support education beyond those then extant." Sundlun, 662 A.2d at 49.  The duties that existed with regard to public education when the Constitution was ratified in 1842 were slim—the state began to provide funding for public schools in 1828, but this merely supplemented local contributions, the

amounts of which were determined by each community. Id. at 46.  It was not until 1882, forty years after the adoption of the Constitution, that the General Assembly created a state system of education by mandating that every town establish a public school. Id. at 48.  As we noted in Sundlun, "[t]o suggest that the 1842 Constitution imposed upon the General Assembly a duty to compensate for a town's inability to raise local taxes is wholly unreasonable, given that towns were not required to fund such endeavors at all." Id. at 49.

The portion of the Education Clause concerning education was not substantively revised during the constitutional convention of 1986, despite numerous efforts to amend the language in order to provide what was thought to be a more equitable school funding system. Sundlun, 662 A.2d at 49.  We noted in Sundlun:

> "The convention's adoption of article 12, section 1, signifies that the framers of the 1986 Constitution did not intend to alter the state's approach to funding education or to impose new constitutional requirements upon the General Assembly in respect to education. * * * The framers * * * had the opportunity to radically alter the nature of the state's role in public education. They chose not to do so." Sundlun, 662 A.2d at 50.

Thus, in Sundlun we addressed the issue of whether the General Assembly is constitutionally obligated to establish a system of public schools that provides the opportunity for an equitable, adequate education for all children in the state.  After expounding on the history of the constitutional treatment of public education, we determined that the General Assembly is not constitutionally required to provide for such a system.  Having made this determination, however, we were left to define the substantive rights, if any, created by the language of article 12, section 1.  After examining the meaning of the word "promote" in its historical and contemporary contexts, we concluded:

> "[T]he word 'promote' in article 12, section 1, does not mean 'found' or 'establish.'  The meaning of the word in its historical

- 14 -

context clearly precludes such a definition, first, because the towns themselves 'founded' or 'established' their public schools, not the General Assembly, and, second, because the State Constitution of 1842 did not require the founding or establishing of a public school in every town. The historical evidence demonstrates that since the time article 12 was adopted, the establishment of schools has been left to the local communities although financial and other assistance were provided by the state." Sundlun, 662 A.2d at 56.

We then went on to discuss the remaining language of article 12, section 1, which states that it shall be the duty of the General Assembly "to adopt all means which it may deem necessary and proper to secure to the people the advantages and opportunities of education * * *." We determined that this portion of the Education Clause vested the General Assembly with plenary power in the realm of public education: "We concur with plaintiffs that the right to an education is a constitutional right in this state, but we stress that article 12 assigns to the General Assembly the responsibility for that right." Sundlun, 662 A.2d at 57.

## 2. Repeal of the Continuing Powers Clause

We also cited in Sundlun to the now-repealed article 6, section 10 of the Rhode Island Constitution—the so-called "Continuing Powers Clause," which read as follows: "The general assembly shall continue to exercise the powers it has heretofore exercised, unless prohibited in this Constitution." See Sundlun, 662 A.2d at 50. We stated:

> "Among the powers the General Assembly had exercised prior to the adoption of the 1986 Constitution was the power to promote public education through a statutory funding scheme and through reliance on local property taxation. The ratification of article 6, section 10, of the Rhode Island Constitution of 1986 represented a knowing and an express endorsement of the Legislature's primacy over education. * * * It is thus clear that the General Assembly's plenary and exclusive power over public education in Rhode Island has not changed since the adoption of the State Constitution in 1842." Sundlun, 662 A.2d at 50.

The plaintiffs' main contention on appeal is that, because the Rhode Island electorate has since repealed article 6, section 10 of the Rhode Island Constitution, this Court now has "the Constitutional responsibility to review legislative action more closely" than we did when we decided Sundlun. The plaintiffs argue that "Sundlun followed more than a century of precedents that interpreted the 'continuing powers' clause to support Rhode Island's constitutional doctrine of legislative supremacy" and that "[t]he Sundlun [c]ourt relied upon the 'continuing powers' clause in establishing a highly deferential standard of judicial review." The defendants disagree, arguing that the repeal of article 6, section 10 did not affect article 12, section 1, which grants plenary power over education to the General Assembly.

The plaintiffs are correct in their assertion that our state government has undergone significant changes since we decided Sundlun. In 2004, Rhode Island's electorate approved four amendments to the state constitution, commonly referred to as the "separation of powers amendments." These amendments clearly established, for the first time in Rhode Island's history, three separate and distinct departments of government. One of these amendments consisted of repealing the Continuing Powers Clause, article 6, section 10.

We addressed the implications of the separation of powers amendments in In re Request for Advisory Opinion from the House of Representatives (Coastal Resources Management Council), 961 A.2d 930 (R.I. 2008) (hereinafter "CRMC"). That request for an advisory opinion required us to review, in light of the separation of powers amendments, legislation that permitted members of the General Assembly to sit as members of the Coastal Resources Management Council. While analyzing the issues presented in CRMC, we discussed the implications of the separation of powers amendments in areas where the General Assembly possesses plenary power:

- 16 -

"The proponents and drafters of the constitutional amendments, which were designed to bring about a greater degree of separation of powers in Rhode Island's governmental structure, manifestly carried out their task with precision. Certain powers of the General Assembly were explicitly curtailed, while others were left largely or entirely unaffected by the amendments.

"For example, one of the proposals ultimately approved by the electorate was the abolition of the venerable 'continuing powers' provision of the Constitution (article 6, section 10); that provision expressly allowed the General Assembly to continue to exercise any power that it had possessed prior to the 1986 constitutional convention unless expressly prohibited by the Constitution. The continuing powers conferred by article 6, section 10 were characterized by this Court as 'plenary.' * * * It is clear that those 'continuing powers' have now been explicitly and definitively repealed.

"In contrast, the separation of powers amendments did not, either explicitly or implicitly,[] limit or abolish the power of the General Assembly in any other area where we have previously found its jurisdiction to be plenary.[] Such areas include the General Assembly's duty to provide for the state's natural environment (article 1, section 17); its regulatory power over lotteries (article 6, section 15); and its duty with respect to education and public library services (article 12, section 1)." CRMC, 961 A.2d at 935-36 (emphasis added).

The plaintiffs assert that we based our holding in Sundlun on the Continuing Powers Clause, which has now been repealed; thus, according to plaintiffs, we may not now rely on our previous decision for our interpretation of article 12, section 1. We disagree. We did note in Sundlun that, prior to the adoption of the 1986 Constitution, the General Assembly exercised "the power to promote public education through a statutory funding scheme and through reliance on local property taxation," and we stated that the Continuing Powers Clause "represented a knowing and an express endorsement of the Legislature's primacy over education." Sundlun, 662 A.2d at 50. We cannot say, however, that our decision in Sundlun depended on this language. The bulk of our written opinion consisted of an historical analysis of Rhode Island's public

education system, the General Assembly's related legislative acts, and an examination of the language of article 12, section 1, within its historical context. See id. at 45-57.

Furthermore, as we noted in CRMC, "the separation of powers amendments did not * * * limit or abolish the power of the General Assembly in any other area where we have previously found its jurisdiction to be plenary.[]" CRMC, 961 A.2d at 935-36. Plenary power means that "all * * * determinations [are left] to the General Assembly's broad discretion to adopt the means it deems 'necessary and proper' in complying with the constitutional directive." Id. at 938 (quoting Sundlun, 662 A.2d at 56).

Our prior case law reveals that the Education Clause has always been interpreted in a manner that grants the General Assembly broad discretion in carrying out its constitutional duty to promote public education in Rhode Island, and this interpretation has not been based on the Continuing Powers Clause. See, e.g., Brown v. Elston, 445 A.2d 279, 285 (R.I. 1982) (reaffirming that article 12 "vests the State Legislature with sole responsibility in the field of education"); Coventry School Committee v. Richtarik, 122 R.I. 707, 712, 411 A.2d 912, 914 (1980) (reiterating that public education is the responsibility of the General Assembly, and that school committees act as agents of the state when discharging their responsibilities); Members of Jamestown School Committee v. Schmidt, 122 R.I. 185, 195, 405 A.2d 16, 21-22 (1979) (holding that article 12, section 1 permits the state to provide programs for busing students to nonpublic schools); Royal v. Barry, 91 R.I. 24, 31, 160 A.2d 572, 575 (1960) (stating that article 12, section 1 "expressly and affirmatively reserves to the [L]egislature sole responsibility in the field of education"). Thus, while the separation of powers amendments did effect substantial changes in the structure of our government, they did not impair the General Assembly's broad discretion in adopting "all means which it may deem necessary and proper to secure to the

- 18 -

people the advantages and opportunities of education * * * ." R.I. Const. art. 12, sec. 1 (emphasis added).

### 3. Applying <u>Sundlun</u> and <u>CRMC</u> to Plaintiffs' Education Clause Claim

It is appropriate at this juncture to note that, "[u]nder the doctrine of <u>stare decisis</u>, 'courts should adopt the reasoning of earlier judicial decisions if the same points arise again in litigation.'" <u>State v. Werner</u>, 865 A.2d 1049, 1056 (R.I. 2005) (quoting <u>Johnston Ambulatory Surgical Associates, Ltd. v. Nolan</u>, 755 A.2d 799, 807 (R.I. 2000)). We have previously stated that "this Court always makes a concerted effort to adhere to existing legal precedent." <u>Pastore v. Samson</u>, 900 A.2d 1067, 1077 (R.I. 2006). We will, however, bear in mind that "<u>stare decisis</u> is a principle of policy and not a mechanical formula of adherence to the latest decision, however recent and questionable, when such adherence involves collision with a prior doctrine more embracing in its scope, intrinsically sounder, and verified by experience." <u>State v. Musumeci</u>, 717 A.2d 56, 64-65 (R.I. 1998) (quoting <u>Helvering v. Hallock</u>, 309 U.S. 106, 119 (1940)). We also recognize that, as an advisory opinion, <u>CRMC</u> has no precedential value. <u>See</u> <u>Irons v. Rhode Island Ethics Commission</u>, 973 A.2d 1124, 1132 n.15 (R.I. 2009). Moreover, our statement therein concerning the General Assembly's plenary authority with respect to its duties in the domain of education is clearly <u>dictum</u>. Nevertheless, we find it to be highly persuasive, and, now that we are confronted with the Education Clause directly, we find it to be an accurate statement of constitutional law.

The hearing justice applied <u>Sundlun</u> and <u>CRMC</u> to the facts alleged in the instant case and found that these prior decisions warranted dismissal of plaintiffs' Education Clause claim. We concur with the hearing justice's findings in this regard. The plaintiffs object to the General Assembly's system for regulating and funding public education, claiming that the state has

- 19 -

harmed children by "replacing local control with State-level mandates" while imposing a funding system that prevents municipalities from attaining the resources necessary to meet the requirements. In our opinion, the factual allegations in plaintiffs' complaint make a strong case to suggest that the current funding system is not beneficial to students in Pawtucket and Woonsocket, especially when compared to other municipalities. We are sensitive to plaintiffs' concerns, and yet our prior case law clearly declares that the General Assembly has exclusive authority to regulate the allocation of resources for public education.

This is not to say, however, that there could not be a situation in which the General Assembly violates its "constitutional mandate to support and promote education so as to warrant a judicial response." Sundlun, 662 A.2d at 57. We agree with our prior holding in Sundlun that the Rhode Island Constitution imposes an affirmative duty upon the General Assembly to promote public schools. It is not our function, however, to explore hypothetical scenarios beyond the facts that are currently before us on review.

**B**

**Separation of Powers**

The hearing justice also based her decision to dismiss plaintiffs' Education Clause claim on the separation of powers doctrine. This doctrine is set forth in article 5 of the Rhode Island Constitution, which states: "The powers of the government shall be distributed into three separate and distinct departments: the legislative, executive and judicial." We have previously held that "[t]he separation of powers doctrine prohibits the usurpation of the power of one branch of government by a coordinate branch of government." Moreau v. Flanders, 15 A.3d 565, 579 (R.I. 2011) (quoting Town of East Greenwich v. O'Neil, 617 A.2d 104, 107 (R.I. 1992)). "Functionally, the doctrine may be violated in two ways. One branch may interfere

impermissibly with the other's performance of its constitutionally assigned function. * * * Alternatively, the doctrine may be violated when one branch assumes a function that more properly is entrusted to another." Sundlun, 662 A.2d at 58 (quoting I.N.S. v. Chadha, 462 U.S. 919, 963 (1983) (Powell, J., concurring)).

In Sundlun, we concluded that the plaintiffs' legal and factual claims had urged a violation of the separation of powers in two respects: they asked us to "interfere with the plenary constitutional power of the General Assembly in education"; and they "urg[ed] that we order 'equity' in [educational] funding sufficient to 'achieve learner outcomes.'" Sundlun, 662 A.2d at 58. The plaintiffs in that case had specifically asked the court to "devise, enact, and implement a system of aid to education that would fairly levy the taxes necessary to provide equal educational opportunities to students and that would assign educational resources as uniformly as was practical." Id. at 43. We were deeply troubled by the trial justice's resolution of the plaintiffs' claims, which consisted of adopting a judicially unmanageable standard—"the right to receive an 'equal, adequate, and meaningful education.'" Id. at 58.

Here, plaintiffs have focused their argument on the "duty to promote" portion of the Education Clause, and they have framed their appeal "in terms of whether this Court has any role whatever in reviewing the General Assembly's duty to promote public schools under [article 12, section 1]." Instead of asking us to formulate a new system of educational funding, plaintiffs have asked us to declare that the legal framework established by the General Assembly for regulating and funding public education creates unattainable mandates and, therefore, fails to "promote" public schools. Functionally, however, these two claims represent a request for the same impermissible goal: imposing our own judgment over that of the Legislature in order to determine whether a particular policy benefits public education. We decline to interfere with the

General Assembly's prerogative to fashion the policies that it, as a collective representative of the people, deems most appropriate for the establishment and maintenance of the state's public schools.[9]

We emphasize that we are deeply concerned by the conditions of the schools in Pawtucket and Woonsocket as alleged by plaintiffs, as well as by the alleged predicaments of those municipalities regarding their inabilities to allocate the funding required to meet state mandates. Installing a means of providing adequate educational opportunities to every child in the state is not only an admirable goal; it is "perhaps the most important function of state and local governments." San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 29 (1973) (quoting Brown v. Board of Education, 347 U.S. 483, 493 (1954)). An educated populace is an essential element of our system of government, necessary for the continued protection of our rights and liberties. The framers of our constitution clearly reflected these ideas when they drafted article 12, section 1. We, however, are not the branch of government that the framers charged with implementing a system of education. The plaintiffs' complaint is more appropriately addressed to the General Assembly, which has been charged with both the power and the duty to address their concerns.[10]

---

[9] Indeed, the arena of education policy presents many difficult dilemmas that are not easily resolved. Reasonable minds could reach many different conclusions regarding how best to accomplish the goal of educating our state's children. For example, South Korea and Finland are known to produce some of the best educational outcomes in the world; they accomplish these outcomes, however, through two entirely different educational frameworks. See Best Education In the World: Finland, South Korea Top Country Rankings, U.S. Rated Average, http://www.huffingtonpost.com/2012/11/27/best-education-in-the-wor_n_2199795.html?view=print&comm_ref=false (last visited March 4, 2014). We, the unelected judiciary, are not suited to make these difficult policy decisions for the people of Rhode Island.

[10] The plaintiffs and defendants also raised the issue of whether this case presents a nonjusticiable political question. Because we have decided the matter on the grounds of our

## C

## Substantive Due Process

The plaintiffs also argue that the 2010 funding formula violates substantive due process because it "is an arbitrary and capricious political solution" that impairs plaintiffs' "fundamental right to adequately funded education in the basic core subjects." Substantive due process is found in article 1, section 2 of the Rhode Island Constitution, which provides in pertinent part: "No person shall be deprived of life, liberty or property without due process of law, nor shall any person be denied equal protection of the laws."

The first inquiry in a substantive due process analysis is whether the challenged government action affects a fundamental right. Riley, 941 A.2d at 205-06. We have previously held that the Rhode Island Constitution does not provide a fundamental right to education, and we do not presently perceive any reason to question this holding. See Sundlun, 662 A.2d at 55. We have also held, however, that "[t]he substantive component of due process 'guards against arbitrary and capricious government action.'" East Bay Community Development Corp. v. Zoning Board of Review of Barrington, 901 A.2d 1136, 1150 (R.I. 2006) (quoting Brunelle v. Town of South Kingstown, 700 A.2d 1075, 1084 (R.I. 1997)). Thus, when no fundamental right is at issue, a party seeking to establish a substantive due process violation must show that the challenged statute or action is "clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare." Id. (quoting Cherenzia v. Lynch, 847 A.2d 818, 826 (R.I. 2004)).

Here, count 2 of the plaintiffs' complaint appears only to assert a claim that the General Assembly's failure to provide adequate funding has impaired their perceived right to an

previous precedent and the separation of powers doctrine, we decline to address the political question issue.

- 23 -

education.  On appeal, however, the plaintiffs focus their due process argument on the alleged arbitrariness and capriciousness of the 2010 funding formula.  The hearing justice addressed both of these potential substantive due process claims and found the plaintiffs' complaint insufficient to establish either one.  We agree with the hearing justice's conclusions in this regard.  Although the plaintiffs spare no ink in outlining the alleged inadequacies of the 2010 funding formula, they do not present facts to suggest that this legislative enactment is devoid of any "substantial relation to the public health, safety, morals, or general welfare."  See East Bay Community Development Corp., 901 A.2d at 1150 (quoting Cherenzia, 847 A.2d at 826).

## IV

## Conclusion

For the reasons stated herein, we affirm the order of the Superior Court.  The record shall be returned to the Superior Court.


**TITLE OF CASE:**     Woonsocket School Committee et al. v. The Honorable Lincoln Chafee in his official capacity as the Governor of the State of Rhode Island et al.

**CASE NO:**     No. 2012-271-Appeal.
(PM 10-946)

**COURT:**     Supreme Court

**DATE OPINION FILED:**     May 2, 2014

**JUSTICES:**     Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**     Chief Justice Paul A. Suttell

**SOURCE OF APPEAL:**     Providence County Superior Court

**JUDGE FROM LOWER COURT**:

Associate Justice Netti C. Vogel

**ATTORNEYS ON APPEAL:**

For Plaintiffs:  Samuel D. Zurier, Esq.
Stephen M. Robinson, Esq.

For Defendants:  Rebecca T. Partington, Esq.
Claire J. Richards, Esq.